UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; <br><br> CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and MARY LOU JAMES, individually, <br><br> CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, <br><br> PLAINTIFFS <br> v. <br><br> BRAD LIVINGSTON, individually and in his official capacity, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH <br><br> DEFENDANTS | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. <br> 3:13-cv-217 <br> JURY DEMANDED |

**PLAINTIFFS' RESPONSE TO DEFENDANT UNIVERSITY OF TEXAS MEDICAL BRANCH'S MOTION TO DISMISS**

## I.  SUMMARY OF THE RESPONSE

The Court should deny Defendant University of Texas Medical Branch's (UTMB) Motion to Dismiss because Plaintiffs allege – with ample factual support – viable claims under the American with Disabilities Act and Rehabilitation Act.

Douglas Hudson, Kenneth Wayne James, and Rodney Adams were housed at the Gurney Unit and suffered from hypertension and depression, disabilities UTMB knew rendered them vulnerable to heat stroke when temperatures soared above 90 degrees.

Despite knowing that Hudson, James and Adams were at grave risk in these conditions, UTMB failed to give the men intake physicals, failed to modify or restrict their housing assignments, and failed to provide them any protection from the extreme heat.

As a consequence, the men endured brutally hot, non-air-conditioned prison dormitories with apparent temperatures[1] exceeding 100 degrees, could not cool their bodies, and died from heat stroke in the summers of 2011 and 2012.[2]

---

[1] Apparent temperature is also called the "heat index" – the combination of heat and humidity that reflects what the body actually "feels." (Complaint, ¶ 24).

[2] Nor are these the only three people with heat related disabilities that UTMB discriminated against that died. As alleged in the complaint, thirteen inmates with similar disabilities died from heat stroke in TDCJ's non-air conditioned prisons where UTMB provides medical care. (*Id.*, ¶ 27).

By intentionally choosing not to provide intake physicals and by not restricting their housing placement, UTMB denied Adams, James and Hudson safe housing and access to medical care, and violated the ADA and Rehabilitation Act.

Accordingly, the Court should deny UTMB's motion to dismiss.

**II. FACTS**

UTMB provides medical care at the Gurney Unit, a Texas Department of Criminal Justice (TDCJ) prison.

The prison's inmate dormitories are not air conditioned, and prison authorities make no attempt to cool them. As a result, the apparent temperatures indoors routinely exceed 100 degrees. (Complaint, ¶¶ 22, 114-115, 123-124, 129-130, 134). Based on internal policies and documents, autopsy reports, and basic medical knowledge, UTMB officials at the highest levels know these extreme temperatures put prisoners at risk of injury and death, and have caused at least thirteen heat-stroke deaths since 2007. (*Id*. ¶¶ 85, 87, 93).

In this case, Adams, James and Hudson lived with serious disabilities, and met the criteria UTMB and TDCJ recognize for putting them at risk of heat-related illness or death. For example,

- Rodney Adams, 45, suffered from depression and required psychotropic medications that dehydrated him. (*Id*. ¶ 131).

- Douglas Hudson, 62, suffered from depression and hypertension. He took psychotropic medications to treat his depression, and a beta-blocker to

   treat hypertension, both of which caused his body to become dehydrated. (*Id*. ¶ 116).

- Kenneth Wayne James, 52, suffered from hypertension and required a diuretic medication that further dehydrated him. (*Id*. ¶ 122).

The men's disabilities and the medications they took to treat their conditions made their bodies more susceptible to heat stroke. (*See id*. ¶ 26).

In particular, hypertension "increases a patient's susceptibility to heat stress, and, combined with heat, can cause impaired motor and cognitive function, reduced blood flow, and a breakdown of the blood/brain barrier. Heart disease diminishes the body's ability to regulate internal temperature." (*Id.* ¶ 106). Diuretics and beta blockers used to treat hypertension put patients at heightened risk for heat stroke by dehydrating the body and diminishing one's ability to sweat. (*Id*. ¶ 107-108).

Likewise, UTMB policy observes prisoners taking certain medications to treat depression (like the ones decedents took) are at increased risk of heat-related illness, and "should not be allowed to work or recreate in environments where the apparent air temperature is 95 [degrees] or higher." (*Id*. ¶ 111).

Even though UTMB's highest ranking officials indisputably know about these dangers, and their policies identify the hazard, UTMB chooses not to restrict prisoners housing in any way, or even recommend housing prisoners with these heat-sensitive disabilities in safe conditions. (*Id*. ¶ 41, 101). Rather, UTMB's

4

policies limit only labor and recreation when dealing with heat-sensitive disabilities, not housing – even though UTMB is well aware prisoners may spend twenty-three hours a day inside. (*See id.* ¶ 40).

Moreover, UTMB is empowered and obligated to restrict an inmate's housing when his or her disability requires it. In fact, UTMB requires TDCJ to house prisoners who use wheelchairs in wheelchair-accessible facilities. But UTMB has no corresponding policy to ensure prisoners who are at increased risk of heat-related death receive housing accommodations for their disabilities, even though it could easily do so and death from heat stroke is the consequence. (*Id.* ¶ 41).

In addition to denying safe housing to the decedents, UTMB provides no intake physical for incoming prisoners to the Gurney Unit for at least seven to ten days, even though prisoners' heat-sensitive conditions are known when they come into the prison. (*Id.* ¶¶ 60-63). Until the intake physical occurs, UTMB does not medically evaluate prisoners to identify who needs housing accommodations, even though the disabilities that make them exceptionally vulnerable to heat stroke are known to them before the inmates enter the prison. (*Id.*; *see also* ¶¶ 116, 122, 131). In the case of each of the decedents, they had only been at the Gurney Unit a short time before they collapsed from heat stroke – Hudson had been there four days, James three days, and Adams less than 24 hours. (*Id.* ¶¶ 53-55).

5

Though UTMB knew Hudson, James and Adams were at risk and its own policies identify people with these disabilities (including hypertension, depression and diabetes) as those most likely to suffer or die due to exposure to extreme temperatures, UTMB's employees failed to place these men in safe housing, failed to get them a physical, and provided them no protection from the heat whatsoever. (*Id*. ¶¶ 60, 85).

During periods of extreme temperatures, this discrimination is deadly. Prisoners arrive at the brutally hot Gurney Unit from county jails where state law requires air conditioning. (*Id*. ¶ 51; *see also* 37 TEX. ADMIN. CODE §259.160). Because their bodies are not acclimated to the extreme temperatures, they are at much greater risk of heat-related death – a risk that is well known to UTMB, but that UTMB medical providers and policymakers simply disregard. (*Id*. ¶ 50).

As a consequence, Hudson, James and Adams could not cool their bodies and died a painful death from heat stroke. (*Id*. ¶¶ 117-118, 125-127, 134-142). The oppressive heat caused them to suffer multi-system organ failure when their body temperatures soared well above 105 degrees. (*Id*.)

### III. ARGUMENT AND AUTHORITIES

#### A. Standard of Review

Motions to dismiss for failure to state a claim are "viewed with disfavor and [are] rarely granted." *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).

"Under the 12(b)(6) standard, all well-pleaded facts are viewed in the light most favorable to the plaintiff," though "plaintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim." *Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (citing *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 152-53 (5th Cir. 2010)). "The complaint must provide more than conclusions, but it need not contain detailed factual allegations." *Turner*, 663 F.3d at 775 (internal citations omitted). The complaint only needs to "allege enough facts to move the claim 'across the line from conceivable to plausible.'" *Id*. (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).[3]

A claim is correctly pled when the facts go beyond "threadbare recital of the elements of a cause of action, supported by mere conclusory statements." *Patrick v. Wal-Mart, Inc.-Store No. 155*, 681 F.3d 614, 622 (5th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678). And when a governmental entity is the defendant, plaintiffs will often not have access to critical documents before conducting discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011).

### B. Plaintiffs Plead Viable ADA and Rehab Act Claims

To allege a claim under the ADA and Rehab Act, a plaintiff must plead: (1) that he is a qualified individual within the meaning of the acts; (2) that he is being

---

[3] "Determining whether the plausibility standard has been met is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Turner*, 663 F.3d at 775 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

excluded from participation in, or being denied benefits of, services, programs, or activities for which the public entity is responsible, or is otherwise being discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination is by reason of his disability. *Lightbourn v. County of El Paso, Tex.*, 118 F.3d 421, 428 (5th Cir. 1997). Plaintiffs' complaint easily meets this standard.

- *The Prisoners Suffered from a Disability*

UTMB's motion does not contest Hudson, James and Adams were qualified individuals with a disability – depression and hypertension.

- *Medical Care and Safe Housing in Prison are "Services or Programs"*

Writing for a unanimous Supreme Court, Justice Scalia explained confinement in a jail or prison is a program or service for ADA/Rehabilitation Act purposes. *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 211 (1998).

Thus, when a person has a disability the ADA/Rehabilitation Act requires public entities to provide a "reasonable accommodation" to assist them in accessing public programs and services. *Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 672 (5th Cir. 2004). In *McCoy v. Texas Dep't of Criminal Justice*,[4] the Court explained a failure to make reasonable accommodations in the prison context constitutes "discrimination" under the ADA and Rehabilitation Act because

---
[4] 2006 U.S. Dist. LEXIS 55403, *22 (S.D. Tex. 2006) (citing *Melton*, 391 F.3d at 672),[4]

"failure to make reasonable accommodations to the needs of a disabled prisoner may have the effect of discriminating against that prisoner because the lack of an accommodation may cause the disabled prisoner to suffer more pain and punishment than non-disabled prisoners." *Id.* (*citing United States v. Georgia*, 546 U.S. 151 (2006)).

Moreover, the Supreme Court has expressly held the denial of medical care to individuals with disabilities, such as an intake physical and accompanying housing restrictions, can form the basis of a valid the ADA and Rehabilitation Act. *See Georgia*, 546 U.S. at 157.

The Rehabilitation Act follows the same standards, adding only the requirement that the entity also receive federal funding, as the complaint alleges UTMB does. (Complaint, ¶ 19). *See* 42 U.S.C. § 12133 ("The remedies, procedures, and rights set forth in section 505 of the Rehabilitation Act of 1973 shall be the remedies, procedures and rights this title provides to any person alleging discrimination on the basis of disability in violation of [Title II of the ADA]"); 29 U.S.C. § 794(a) (2006). Courts interpret the ADA and Rehabilitation Act under the same body of law. *See, e.g.*, *Bennett-Nelson v. Louisiana Board of Regents*, 431 F.3d 448, 455 (5th Cir. 2005). Thus, Plaintiffs have satisfied the elements of a Rehabilitation Act claim as well.

- *The Prisoners Were Denied Services and Excluded from Prison Programs Because of Their Disabilities*

9

Finally, the complaint plainly alleges UTMB disregarded Hudson, James and Adams' disabilities by failing to provide the decedents safe housing and medical care UTMB knew they needed because of their disabilities. Thus, the decedents could not participate in the prison's programs and died – undoubtedly suffering more "pain and punishment" than other able-bodied prisoners at the Gurney Unit.

In particular, UTMB failed to provide the decedents an intake physical, failed to restrict or modify their housing so that it was safe, and failed to provide the decedents any accommodation to protect them from the extreme heat they faced. And Hudson, James and Adams died because of this.

Moreover, while prisoners without disabilities like hypertension, depression or diabetes may suffer in the extreme heat, they do not share the same risk of life-threatening injuries or death. (Complaint, ¶¶ 110-112, people taking antidepressants at greater risk of heat stroke; para. 105-108, hypertensives at greater risk). By housing Hudson, James and Adams in extremely hot temperatures, such as were common at the Gurney Unit in the summer, UTMB knowingly endangered their lives and discriminated against them because of their disability.

This discrimination is no different than denying wheelchairs or crutches to inmates with mobility impairments. Without wheelchairs or crutches, inmates with

mobility disabilities cannot safely move about the prison and are at risk of injury. Without safe, cooler housing conditions that do not place their lives at risk, people with hypertension or depression cannot cool their bodies, become sicker than able-bodied people, and are at significant increased risk of heat stroke and death.

Thus, Plaintiffs have adequately alleged that UTMB denied Hudson, James and Adams safe housing and needed medical care because of their disabilities.

## IV. REQUEST FOR ORAL ARGUMENT

Plaintiffs respectfully request oral argument on this motion. Brian McGiverin, a lawyer practicing less than seven years, will argue the motion for the Plaintiffs pursuant to the Court's standing order. Mr. McGiverin contributed significantly to the preparation of this response.

## CONCLUSION

For the foregoing reasons, the Court should deny UTMB's motion to dismiss.

Date: July 23, 2013.

Respectfully submitted,

The Edwards Law Firm
The Bremond Houston House
706 Guadalupe
Austin, Texas 78701
    Tel.   512-623-7727
    Fax.  512-623-7729

By   /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS

## **CERTIFICATE OF SERVICE**

    By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Southern District of Texas.

By   /s/ Jeff Edwards
JEFF EDWARDS