UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; | § § § § § | |
| CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and MARY LOU JAMES, individually, | § § § § § § § § § § | |
| CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, | § § § | CIVIL ACTION NO. 3:13-cv-217 |
| PLAINTIFFS | § § | JURY DEMANDED |
| v. | § | |
| BRAD LIVINGSTON, individually and in his official capacity, JOE OLIVER, NANCY BETTS, L. FIELDS, JOHN DOE, ROBERT LEONARD, BRANDON MATTHEWS, DEBRA GILMORE, SARAH RAINES, DANNY WASHINGTON, MATTHEW SEDA, TULLY FLOWERS, DORIS EDWARDS, LINDA McKNIGHT, REVOYDA DODD, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, REGINALD GOINGS, and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH | § § § § § § § § § § § § § § § § § § | |
| DEFENDANTS | § | |

**<u>Plaintiffs' Response to the TDCJ[2] Defendants' Motion to Transfer Venue</u>**

## I.  SUMMARY OF THE CASE

This is a case about cruel and unusual punishment and discrimination in the Texas prison system based on practices adopted at the highest levels of the University of Texas Medical Branch ("UTMB") and the Texas Department of Criminal Justice ("TDCJ").

UTMB and TDCJ officials have long known that prisoners like Rodney Adams, Kenneth Wayne James, and Douglas Hudson with disabilities including hypertension, and depression, are at grave risk in extremely hot temperatures. TDCJ and UTMB officials have long known that the indoor temperatures at the Gurney Unit exceed 100 degrees between June and September. And TDCJ and UTMB officials also knew that the indoor temperatures at the Gurney Unit were even hotter and more dangerous during the summer of 2011. Yet despite this knowledge, TDCJ and UTMB officials did not place any restrictions on the housing of Adams, James, and Hudson – such as recommending each spend several hours a day in an air-conditioned part of the prison or by moving them to an air-conditioned unit – something they easily could have done.

---

[2] Only the TDCJ defendants, not UTMB, move for transfer. The TDCJ defendants include the Texas Department of Criminal Justice, Brad Livingston, its executive director, Rick Thaler, the former director of the institutional division, Williams Stephens, the current director of the institutional division, Robert Eason, a regional director, Dennis Miller, the former warden of the Gurney Unit, Reginald Goings, the current warden, and correctional officers Leonard, Matthews, Gilmore, Raines, Seda, Flowers, Edwards, and Dodd.

Instead, TDCJ and UTMB officials purposefully subjected Adams, James, Hudson and numerous others suffering from similar disabilities to brutally hot, dangerous conditions. As a direct and proximate result, James, Adams and Hudson died painful and entirely preventable deaths from heat stroke.

## II.    SUMMARY OF PLAINTIFF'S RESPONSE

The TDCJ[3] defendants' motion to transfer should be denied for four reasons.

First, in this case, officials at the highest levels of TDCJ and UTMB knowingly subjected weak, sick and disabled people (like decedents Adams, James and Hudson) known to be vulnerable to extreme heat to temperatures they knew could harm and kill them. Unlike the usual prison case, the facts necessary to prove Plaintiffs' allegations go beyond the Gurney Unit in Tennessee Colony, Texas. Rather, key documents here are UTMB policies made in Galveston by doctors working in Galveston, and TDCJ policies created in Huntsville, which is in the Southern District and is just as close to Galveston as Tyler. Thus, UTMB doctors and administrators, as well as senior level TDCJ officials working in Huntsville, not just correctional officers at the Gurney Unit, will be key liability witnesses in this case.

Second, vital non-party witnesses such as Dr. David Walker, M.D. and Dr. Judith Aronson, M.D., the pathologists who determined Adams, James, and

---

[3] Neither UTMB nor the medical providers named herein moved for transfer.

Hudson died from heat stroke, are within the subpoena power of Galveston, but not Tyler. Trial in Galveston is also more convenient for willing witnesses, like Cade Hudson, Mr. Hudson's son, and Mary Lou James, Mr. James' elderly mother.

Third, Plaintiffs have alleged UTMB systematically failed to accommodate weak and disabled prisoners, and UTMB that is responsible for managing the medical care for prisoners not just at the Gurney Unit, but at 80% of TDCJ facilities statewide.  Thus, Galveston has as much an interest in the outcome of this case as any jurisdiction in Texas.

Fourth, trial can occur more quickly in the Galveston division.

Accordingly, the TDCJ defendants cannot meet their burden to show that Tyler is clearly a more convenient venue, and their motion to transfer venue should be denied.

## III.   PERTINENT FACTS

The prison's inmate dormitories are not air conditioned, and prison authorities make no attempt to cool them. As a result, the apparent temperatures indoors routinely exceed 100 degrees. (Amended Complaint, ECF 8, ¶¶ 40, 63, 117, 130-131, 150, 175). Based on internal policies and documents, autopsy reports, and basic medical knowledge, UTMB and TDCJ officials at the highest levels know these extreme temperatures put prisoners at risk of injury and death,

and have caused at least fourteen heat-stroke deaths since 2007. (*Id*. ¶¶ 46-48, 67, 129).

In this case, Adams, James and Hudson lived with serious disabilities, and met the criteria UTMB and TDCJ recognize for putting them at risk of heat-related illness or death.  For example,

- Rodney Adams, 45, suffered from depression and required psychotropic medications that dehydrated him. (*Id*. ¶ 199-200).

- Douglas Hudson, 62, suffered from depression and hypertension. He took psychotropic medications to treat his depression, and a beta-blocker to treat hypertension, both of which caused his body to become dehydrated. (*Id*. ¶ 152).

- Kenneth Wayne James, 52, suffered from hypertension and required a diuretic medication that further dehydrated him. (*Id*. ¶ 174).

TDCJ and UTMB knew the men's disabilities and the medications they took to treat their conditions made their bodies more susceptible to heat stroke. (*See id*. ¶¶ 71, 143-44, 147).

Even though UTMB and TDCJ's highest ranking officials indisputably know about these dangers, and their policies identify the hazard, UTMB and TDCJ chose not to restrict prisoners housing in any way, or even recommend housing prisoners with these heat-sensitive disabilities in safe conditions. (*Id*. ¶ 64). Rather, UTMB and TDCJ's policies limit only forced labor and recreation when dealing with heat-sensitive disabilities, not housing – even though UTMB and TDCJ are well aware prisoners may spend twenty-three hours a day inside. (*See id*. ¶ 62).

In addition to denying safe housing to the decedents, UTMB provides no intake physical for incoming prisoners to the Gurney Unit for at least seven to ten days, even though prisoners' heat-sensitive conditions are known when they come into the prison. (*Id.* ¶¶ 85-89). Until the intake physical occurs, UTMB does not medically evaluate prisoners to identify who needs housing accommodations, even though the disabilities that make them exceptionally vulnerable to heat stroke are known to UTMB before the inmates enter the prison. (*Id.*; *see also* ¶¶ 45, 69-73). In the case of each of the decedents, they had only been at the Gurney Unit a short time before they collapsed from heat stroke – Hudson had been there four days, James three days, and Adams less than 24 hours. (*Id.* ¶¶ 78-80).

For budgetary reasons, UTMB and TDCJ discontinued twenty-four-hour medical care at the Gurney Unit. (*Id.* ¶¶ 90-94). This failure to staff the prison around the clock contributed to James and Hudson's deaths – when they fell ill, there was no medical staff available to treat them, significantly delaying their access to health care. (*See id.* ¶¶ 157-168, 177-191). UTMB policy-makers decision to end around the clock care put prisoners at transfer facilities, like the Gurney Unit, at heightened risk because their bodies are not acclimated to the extreme temperature and they have not had intake physicals to identify their disabling serious medical conditions.

During periods of extreme temperatures, these failures are deadly. Prisoners arrive at the brutally hot Gurney Unit from county jails where state law requires air conditioning. (*Id.* ¶ 76; *see also* 37 TEX. ADMIN. CODE §259.160). Because their bodies are not acclimated to the extreme temperatures, they are at much greater risk of heat-related death – a risk that is well known to UTMB and TDCJ, but that UTMB and TDCJ medical providers and policymakers simply disregard. (*Id.* ¶ 75).

As a consequence, Hudson, James and Adams could not cool their bodies and died a painful death from heat stroke. (*Id.* ¶¶ 154-169, 176-193, 203-212). The oppressive heat caused them to suffer multi-system organ failure when their body temperatures soared well above 105 degrees. (*Id.*)

## IV.   ARGUMENT

### A.   Legal Standard

Plaintiffs' choice of venue is entitled to deference unless the moving party can show that transfer is "clearly more convenient than the venue chosen by the plaintiff." *Perry v. Autocraft Investments*, 2013 WL 3338580 at *1 (S.D. Tex 2013) (G. Costa), citing *In re Volkswagen of Am., Inc.*, 545 F. 3d 304, 315 (5th Cir. 2008).

In this case, where Plaintiffs could have brought suit in Galveston or Tyler, the Court must weigh the following public and private concerns in assessing Plaintiff's venue selection, none of which are dispositive:

**(PUBLIC FACTORS)**

>  (1) the administrative difficulties flowing from court congestion;
>  (2) the local interest in having localized interests decided at home;
>  (3) the familiarity of the forum with the law that will govern the case;
>  (4) the avoidance of unnecessary problems of conflicts or law of the application of foreign law; and

**(PRIVATE FACTORS)**

>  (1) the relative ease of access to sources of proof;
>  (2) the availability of compulsory process to secure the attendance of witnesses;
>  (3) the cost of attendance for willing witnesses; and
>  (4) all other practical problems that make trial or a case easy, expeditious and inexpensive.

Here, most factors favor Galveston, not Tyler. Regardless, the TDCJ Defendants have not met their burden to demonstrate that Tyler is "clearly" more convenient than Galveston. Thus, the Court should not grant transfer.

### B.    Plaintiff's choice of venue should be given deference.

As this Court has explained, "when the transferee venue is not clearly more convenient than the venue chosen by the plaintiff, the plaintiff's choice should be respected." *Barnes v. Romeo Papa*, LLCM, 2013 WL 3049236 at *1, (S.D. Tex, June 17, 2013) (G. Costa). As Plaintiffs chose Galveston – primarily because they will be able to get to trial quickly; to avoid inconsistent legal rulings; to have discovery issues heard by the same judge; because Galveston has a significant interest in determining if UTMB, which provides medical care at 80% of TDCJ facilities, systematically failed to accommodate and discriminated against the

weakest, most vulnerable prisoners in TDCJ custody; and because many witnesses are subject to the Court's subpoena power – the Court should treat Plaintiff's venue selection with deference.[4]

### C.   The only relevant public factors favor keeping the case in Galveston.

- **Factor 1 – Court Congestion Favors Galveston**

As this Court has noted in its numerous transfer opinions, "the Galveston Division is unusual in its very low number of criminal cases. As a consequence, this Court is uniquely suited to get a case to trial quickly and to have legal issues heard expeditiously." *Id, citing Federal Court Management Statistics: September 2012, U.S. Courts,* http://www.uscourts.gov/statistics/ FederalCourtManagementStatistics/ *district courts – September – 2012.* Thus, even when compared to the Tyler division, which has a substantial docket of complex patent litigation, Plaintiffs will be able to get to trial more quickly and have motions heard and ruled upon more expeditiously. Thus, the first public factor favors keeping the case in Galveston.

- ***Factor 2 – Galveston has as much local interest in this dispute as any venue in Texas because of UTMB's direct role in the heat related deaths of Adams, James, Hudson and many other prisoners.***

Likewise, the second factor, the locality's interest in having localized interests decided at home, weighs in favor of keeping the case in Galveston.

---

[4] While the named Plaintiffs may not reside in Galveston, Galveston is more convenient than Tyler given its close proximity to Hobby Airport, the many direct flights from Dallas and Lubbock to Houston, and the greater availability of rental properties and/or hotels in Galveston during trial.

Plaintiffs have sued UTMB and its chief executive concerning correctional medicine, Dr. Owen Murray, for (1) failing to accommodate disabled prisoners, and who have died from heat stroke as a consequence of its policies; and for (2) exhibiting deliberate indifference to vast numbers of inmates' medical conditions, many of whom, like Adams, James and Hudson, later died from heat stroke due to the intolerable and brutal heat inside Texas' prisons because their disabilities (hypertension, diabetes, depression) prevent their bodies from cooling down in the intense heat. Despite the fact that Murray and UTMB knew that the hot conditions inside the prisons endangered the lives of inmates with these types of disabilities, including Adams, James and Hudson, they have done nothing to protect or accommodate these prisoners. Rather, Murray and UTMB have adopted policies that deliberately left inmates like Adams, James, and Hudson in grave danger.  As a consequence, Adams, James and Hudson all died from heat stroke at the Gurney Unit, and at least eleven others have died elsewhere from preventable heat strokes.

Significantly, UTMB did not craft these policies at the Gurney Unit in Tennessee Colony. UTMB crafted them in Galveston, and applied them to prisons around the state.  In fact, all of the medical policy decisions relevant to this case, such as whether to require transfer to an air-conditioned facility, to restrict or modify housing assignments in periods of extreme heat would have been global, to mandate immediate intake physicals, and to end around the clock medical care,

were policy based decisions made by high level UTMB officials working at the Galveston campus, such as Dr. Murray.

Moreover, UTMB provides medical care to 80% of Texas' prisoners. Thus, Galveston has a definite local interest in assessing whether it's a major area employer denied accommodations to inmates with heat-related disabilities and failed in its duties to provide adequate access medical care for Texas' inmate population.

While suit could have been filed in the Tyler Division because the Gurney Unit is within 60 miles of Tyler, and Tyler has an interest in assessing whether a warden and correctional officers in its division subjected Adams, James and Hudson to cruel and unusual punishment, Defendants ignore the fact that all TDCJ policies or practices for dealing with extreme heat at the Gurney Unit were crafted, not in Tyler or the Eastern District, but in Huntsville in the Southern District, where the Executive Director of TDCJ and its senior correctional supervisors, *i.e.*, most of the defendants, work and which is ten miles closer to Galveston that Tyler.[5]

Accordingly, as the remaining public factors relevant to the Court's transfer analysis are neutral, the public venue factors favor keeping the case in Galveston.

---

[5] Huntsville is 120 miles from Galveston and 130 miles from Tyler.

### D.     The four private factors also weigh against transfer.

- **Factor 1 – Ease of Access to Proof.**

The first private factor, the relative ease or access to sources of proof, favors Galveston.

For example, UTMB and its records custodians maintain the decedent's medical records in Galveston. In fact, counsel for TDCJ defendants could not provide Plaintiffs with medical records for one of the decedents when asked. Rather, the records came from UTMB.   Likewise, many of the documents necessary in this case are policy documents that are not limited to one prison. These include, among others, training documents from UTMB (located in Galveston), medical policies pertaining to the particular conditions that constitute heat sensitive disabilities (located in Galveston), records concerning UTMB's duties to comply with the ADA and/or Rehabilitation Act (located in Galveston), records concerning UTMB's policies for medical care at prisons throughout the state (located in Galveston based on decisions made in Galveston) and personnel records and peer review documents for its employees (located in Galveston), including those that may have worked in the Tyler Division.

Moreover, Plaintiffs anticipate needing to take numerous depositions in Galveston of high-ranking UTMB officials in its correctional care division.  These include: (1) Dr. Joseph Penn, UTMB's Director of Mental Health Services; (2)

Charles Adams. M.D, UTMB's co-senior medical director; (3) Gary Eubank, UTMB's Director of Nursing; (4) Stephanie Zepeda, UTMB's Director of Pharmacy Services; (5) Beverly Echols, UTMB's Administrative Director of Mental Health Services; (6) Glenda Adams, UTMB's  co-senior medical director; (7) John Pulvino. UTMB's Senior Director of Quality and Outcomes; (8) Ben Raimer, UTMB's delegate on the Correctional Managed Health Care Committee and Senior Vice President for Health Policy and Legislative Affairs; (9) Dr. Owen Murray, the Executive Director of Medical Care in the Correctional Division; and (10) Donna Sulzenberger, the CEO of UTMB's Correctional Care Division.[6] All of these individuals, only one of whom is a named defendant, live and/or work in Galveston. Each are likely to possess evidence concerning UTMB's policies concerning the dangers of extreme heat in prisons, the need to accommodate prisoners with particular mental and physical disabilities, and will have specific knowledge about contracts between UTMB and TDCJ or the State, as well as medical care policy, nursing policy, mental health services in the prisons, and what, if any, quality control, UTMB actually had during the relevant time period. Simply put, numerous witnesses well beyond the subpoena power of Tyler are located in Galveston.[7]

---

[6] Copies of their biographies are attached as Exhibit A.
[7] These witnesses are not only integral to Plaintiffs' case, unlike the witnesses described by TDCJ's counsel as "willing," it is anticipated that these UTMB officials will be anything but willing witnesses and will not be inclined to travel to Tyler for trial, and Plaintiffs will not be able to compel their attendance at trial in Tyler, it would be unfair to transfer the case there.

In addition, UTMB's policies concerning heat-sensitive conditions (or lack thereof), forced labor restrictions (or lack thereof), housing restrictions (or lack thereof), autopsy review (which occurred in Galveston), indifference to serious medical conditions by UTMB officials, were all generated by UTMB in Galveston and are likely to be front and center in this case. And all such records are located at UTMB's Galveston headquarters.

And, despite the TDCJ defendants' claims to the contrary, the TDCJ policies most at issue here are system-wide policies that would have been created and generated at TDCJ's headquarters in Huntsville, which is in the Southern District, and which is closer to Galveston than Tyler.

Plaintiffs have not alleged, and Defendants have certainly offered no proof, that any policymaking decisions concerning heat-sensitive disabilities and vulnerabilities and accommodations made by or not made by TDCJ took place in Tyler. On the contrary, TDCJ's executive director and deputy directors work in Huntsville in the Southern District of Texas, and issued their heat policies – deficient as Plaintiffs allege they were – from Huntsville. Thus, while some documents will certainly be located at the Gurney Unit, the most important documents in this case will not. They are likely to be found either in Huntsville at TDCJ headquarters, or in Galveston at UTMB headquarters.

- **Factor 2 – the availability of compulsory process over witnesses that will actually be deposed or provide trial testimony favors Galveston**

While the TDCJ Defendants acknowledge that nearly all TDCJ witnesses will be willing witnesses, this is not expected to be the case for the many UTMB officials described above. These witnesses are high-level doctors and administrators that will, in all likelihood, be unwilling absent a subpoena to travel to Tyler from Galveston. Accordingly, at least ten meaningful UTMB witnesses will be beyond subpoena power unless the case remains in Galveston.

Moreover, several non-party witnesses, each of whom will provide important testimony concerning causation and the conditions under which Adams suffered, would be greatly inconvenienced by a transfer to Tyler.

- **For Adams and James**

Dr. David Walker is a Professor and Chairman for the Department of Pathology at UTMB in Galveston. He was the attending physician who performed the autopsy of Adams and James. As he concluded that Adams and James died of hyperthermia due to the extreme heat inside the Gurney Unit, his testimony bears directly on causation issues in this case.[8]

---

[8] A copy of his resume is attached in Exhibit A, and the autopsies are attached as Exhibit B.

- **For Hudson**

Dr. Judith Aronson is the Professor and Vice Chair for Education in UTMB's Department of Pathology and the Director of its Autopsy Division.  As Dr. Aronson performed Hudson's autopsy and concluded that he died from hyperthermia due to extreme heat at the Gurney Unit, her testimony bears directly on causation issues in this case.[9]

Additionally, many of witnesses that run TDCJ, such as Directors Livingston, Stephens, and Thaler work in Huntsville, which is actually closer to Galveston than to Tyler (120 miles vs. 130 miles). And TDCJ's representative on the Correctional Managed Care Committee, Dr. Lannette Linthicum, who is expected to testify about TDCJ policies concerning the heat, medical care and feasibility, is also based out of Huntsville. She is therefore closer to Galveston than Tyler.

Likewise, advocates and legislators who have brought these conditions to high-ranking TDCJ officials attention are closer to Galveston. Members of the union representing TDCJ correctional officers have long complained the extreme temperatures in TDCJ's prisons expose its members to dangerous working conditions. Lance Lowry, president of the local of the American Federation of State, County and Municipal Employees, will testify his members have complained

---

[9] A copy of her resume is attached as Exhibit A, and the autopsy is attached as Exhibit B.

to high-ranking TDCJ officials about these dangerous conditions for years. In 2011, shortly before James' death, Rep. Sylvester Turner wrote a letter to Livingston expressing his concern about the extreme temperatures in TDCJ prisons. Rep. Turner has repeatedly raised this issue with high-ranking TDCJ officials over a number of years.

Finally, one issue in this case is the availability of air conditioning at the Gurney Unit and other prisons. In another heat related death case filed in Dallas, before UTMB's refusal to accommodate prisoners with heat sensitive disabilities was known to have played such an integral role in the deaths of these prisoners, the individuals TDCJ designated to testify concerning air conditioning were Thomas Vian and Kim Farguson. Both men work for TDCJ in Huntsville. Both are therefore closer to Galveston. Other important TDCJ witnesses are also located in Huntsville. Bryan Collier, TDCJ's deputy director, recently told the press it was feasible for TDCJ to build climate controlled "swine barns," but not to cool temperatures in prisoners' cells.[10]

For virtually all the most essential witnesses, Galveston is the more convenient venue. Accordingly, the availability of compulsory process favors Galveston.

---

[10] *See* Elizabeth Koh, "Climate-Controlled Swine Buildings Dismay Inmates' Advocates," *Texas Tribune*, Aug. 16, 2013, *available at*: http://www.texastribune.org/2013/08/16/cooling-tdcj-swine-units-dismays-inmate-/

| Witness | Location | Distance to Tyler[11] | Distance to Galveston |
|---------|----------|----------------------|----------------------|
| Judith Aronson (pathologist) | Galveston | 249 miles | 0 miles |
| David Walker (pathologist) | Galveston | 249 miles | 0 miles |
| Bryan Collier (TDCJ Dep. Dir.) | Huntsville | 130 miles | 120 miles |
| Oscar Mendoza (TDCJ Risk Mgr.) | Huntsville | 130 miles | 120 miles |
| Thomas Vian (TDCJ facilities) | Huntsville | 130 miles | 120 miles |
| Kim Farguson (TDCJ facilities) | Huntsville | 130 miles | 120 miles |
| Lannette Linthicum (TDCJ health svcs.) | Huntsville | 130 miles | 120 miles |
| Ben Raimer (UTMB corrections) | Galveston | 249 miles | 0 miles |
| Charles Adams (UTMB corrections) | Houston | 198 miles | 51 miles |
| Brad Livingston (defendant) | Huntsville | 130 miles | 120 miles |
| Rick Thaler (defendant) | Huntsville | 130 miles | 120 miles |
| William Stephens (defendant) | Huntsville | 130 miles | 120 miles |
| Owen Murray (defendant) | Galveston | 249 miles | 0 miles |
| Joseph Penn (dir. mental health) | Galveston | 249 miles | 0 miles |
| Stephanie Zepeda (dir. pharmacy) | Galveston | 249 miles | 0 miles |
| Beverly Echols (admin. dir. mental health svcs.) | Galveston | 249 miles | 0 miles |
| Glenda Adams (sr. medical dir.) | Galveston | 249 miles | 0 miles |
| John Pulvino (dir. quality control) | Galveston | 249 miles | 0 miles |
| Donna Sulzenberger (CEO CHMCC) | Galveston | 249 miles | 0 miles |
| Lance Lowry (TDCJ union) | Huntsville | 130 miles | 120 miles |
| Rep. Sylvester Turner (state legislator) | Houston | 198 miles | 51 miles |

[11] All distances were calculated using Google Maps, www.maps.google.com

- **Factor 3 – The cost associated with the attendance of willing witnesses is difficult to assess at this time but probably favors Defendants unless UTMB witnesses become "willing witnesses."**

Plaintiffs do not deny that there will be some expense to TDCJ to bring witnesses from Tyler to Galveston. However, as far as any prisoners go, TDCJ has complete control over their placement. Because the Gurney Unit is a transfer facility, prisoners only spend a short time there (a maximum of two years) before being transferred to other prisons around the state. Thus, it is unlikely any critical witnesses are still at the Gurney Unit. Moreover, TDCJ could easily transfer any prisoner witnesses to a closer facility in Houston or Beaumont and avoid all the costs they describe in their motion. And numerous TDCJ witnesses, many of whom are defendants and will have to appear for trial, are located in Huntsville — which is closer to Galveston.

In addition, the potential cost and inconvenience to TDCJ would seem to be much less than that to UTMB, who would have to arrange for doctors to be away from patients, even assuming all of the aforementioned UTMB witnesses were willing to come to trial in Tyler.

Finally, the cost to Plaintiffs to attend trial is likely to be less in Galveston than in Tyler as there are more lodging options available to them and more convenient flights into Hobby Airport than Tyler from Dallas.  Mr. James' mother, Mary Lou James, is elderly and disabled – travel will be extremely difficult for her.

She has recently been hospitalized. A direct flight from Lubbock to Houston, and a short drive to Galveston, would minimize the impact on her health.

- **Factor 4 – Practical Considerations Concerning the Speed and Expense of a Trial**

While Plaintiffs do not deny that the location of the alleged wrong can be a factor in the court's venue analysis, the TDCJ defendants ignore every aspect of Plaintiffs' claim against UTMB. Here, UTMB officials – located in Galveston – made decisions and developed policies that discriminated against and ignored the obvious dangers facing prisoners with disabilities. They also performed the autopsies on the decedents. Thus, Galveston is a central location in Plaintiffs' case.

And as a practical matter, this is not the only heat related death case against UTMB and TDCJ currently before the Court.  At least fourteen prisoners have died since 2007 from heat stroke in Texas' prisons, and wrongful death actions involving decedents Robert Allen Webb, Michael Martone, and Alexander Togonidze are also currently before this Court.[12] UTMB is a defendant in each of these cases and the Court currently has pending motions to dismiss in each matter. Keeping the case in Galveston before one judge will, therefore, lessen the risk of inconsistent rulings on key legal issues.

---

[12] *See Martone v. Livingston*, No 3:13-cv-00283 (S.D. Tex. – Galveston); *Webb v. Livingston*, No. 3:13-cv-00218 (S.D. Tex. – Galveston); *Togonidze. v. Livingston*, No. 3:13-cv-00229 (S.D. Tex. – Galveston).  In addition, attached as Exhibit C are autopsies confirming the high number of deaths from hypertension in the Texas' prison system, most of which were performed by Galveston pathologists.

Finally, the case will almost certainly be able to proceed to trial faster in Galveston than in Tyler. Given the importance of having the case tried before UTMB and TDCJ expose disabled prisoners to another summer of extreme heat, practical considerations weigh in favor of keeping the case in Galveston.

### E.   Plaintiff's claims against UTMB are sound

In support of its transfer motion, the TDCJ defendants suggest that Plaintiffs ADA and Rehab Act claims will be dismissed.  Rather than address this meritless argument irrelevant to the Court's venue decision, Plaintiffs refer the Court to its response to UTMB's motion to dismiss [ECF No. 7].

### V.   CONCLUSION

For the foregoing reasons, the Court should deny the TDCJ Defendants' motion to transfer venue, and keep the case in Galveston.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 E. 11th Street
Austin, Texas 78702
  Tel. 512-623-7727
  Fax. 512-623-7729

By /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

21

Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS

CERTIFICATE OF SERVICE

I certify that a copy of this document has been served on all counsel of record through the Court's electronic filing system.

By ___/s/ Jeff Edwards___
JEFF EDWARDS