**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| **ASHLEY ADAMS,** *et al.*, | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 6:13-cv-00712-KNM** |
| | § | |
| **BRAD LIVINGSTON,** *et al.*, | § | |
| *Defendants.* | § | *JURY* |

**DEFENDANT LIVINGSTON, STEPHENS, AND THALER'S MOTION TO DISMISS**
**ON THE BASIS OF QUALIFIED IMMUNITY**

TO THE HONORABLE JUDGE K NICOLE MITCHELL:

Defendants Brad Livingston, William Stephens and Rick Thaler file the following Motion to Dismiss on the basis of Qualified Immunity pursuant to Fed. R. Civ. Proc. 12(b)6) or in the alternative, move for judgment on the pleadings. Fed. R. Civ. Proc. 12(c).

**I.  ALLEGATIONS AGAINST LIVINGSTON, STEPHENS & THALER**
**IN AMENDED COMPLAINT**

Plaintiffs sue TDCJ Director Brad Livingston, TDCJ Correctional Institution Division Director William Stephens and retired TDCJ Correctional Institution Division Director Rick Thaler under 42 U.S.C. 1983 claiming they are liable for the 2011 deaths of three (3) inmates housed by TDCJ at the Gurney Unit in Palestine, Texas. Amended Complaint, page 15, paragraph 46:

| | | | | |
|---|---|---|---|---|
| Kenneth Wayne James | Age 52 | Gurney | died | August 13, 2011 |
| Douglas Hudson | Age 62 | Gurney | died | July 25, 2011 |
| Rodney Adams | Age 45 | Gurney | died | August 3, 2012 |

Plaintiffs do not allege that any of the defendants had any prior knowledge of the decedents' medical history, or circumstances prior to their deaths.  Nor do they allege that these defendants had personal involvement in the medical treatment, supervision, classification, assignment or that defendants had sufficient medical training to qualify to make such decisions.  Plaintiffs do not allege that the Director of TDCJ or that a Director of the Correctional Institutions Division (CID) is

personally involved in making any of the housing assignment, medical classification or any other decisions related to the supervision and care of any of the 152,303 inmates in TDCJ custody including the Plaintiffs' decedents.  An additional 671,886 persons are under TDCJ supervision. Texas Department of Criminal Justice - Fiscal Year 2012 Statistical Report.[1]

Plaintiffs' attempt to hold Directors Livingston, Stephens and Thaler liable for decedents' death based on the "FACTS" section of the Amended Complaint which includes:

**Paragraph 39.   According to the National Weather Service, "heat is the number one weather-related killer in the United States."**

No link or references are provided.  This allegation is as irrelevant to defendants' liability as it is misleading by asserting this allegation as an accepted fact.  While there have been many studies with conflicting conclusions, the Centers for Disease Control concludes that 8015 deaths were heat related and 13,970 deaths were cold weather related during a 21-year period in the United States. American Meteorological Society July 2005[2], article entitled "Heat Mortality Versus Cold Mortality: A Study of Conflicting Databases in the United States."

The New American, December 23, 2008[3], in an article entitled "Heat or Cold: Which Is More Deadly?" reports that:

> "...statistical evidence shows that cold weather is twice as deadly as hot weather...From 1979 to 1997, extreme cold killed roughly twice as many Americans as heat waves, according to Indur Goklany of the U.S. Department of the Interior," Singer and Avery write.  "Cold spells, in other words, are twice as dangerous to our health as hot weather."

> **Paragraph 44.   "...Executive Defendants have done nothing to cool the indoor temperatures to protect inmates from death by stroke."**

---

[1]    http://www.tdcj.state.tx.us/documents/Statistical_Report_FY2012.pdf

[2]    http://journals.ametsoc.org/doi/pdf/10.1175/BAMS-86-7-937

[3]    http://www.thenewamerican.com/tech/environment/item/6665

This collective liability by omission is wholly conclusory and fails to state a federal claim. There are no facts alleged against defendants.  Supervisory officials at the top levels of an agency are not liable for the acts or failure to act of subordinate officials.  *Oliver v. Scott,* 276 F. 3d 736, 742 (5th Cir. 2002).  TDCJ Directors engaged in administrative acts in Huntsville are not alleged to have failed to act in a specific manner as to facts or circumstances existing at any TDCJ unit as to any particular inmate.  Paragraph 44 identifies neither the failure to act of a particular defendant or a particular inmate's circumstances that a defendant supposedly had "done nothing" for.

> **Paragraph 45:  The "Executive Defendants" knew that inmates with certain medical conditions were more susceptible to heat injury.**

Plaintiffs do not allege that these defendants had training or were qualified to make decisions as to the medical care, needs or assignment of any of the decedents.  The Amended Complaint does not allege that these defendants had any knowledge or authority, given the command structure of one of the largest state agencies in Texas, to make day to day decisions on the care, monitoring, housing assignment or medical evaluation of inmates.  *Lee v. Young,* 533 F.3d 505, 511 (7th Cir.2008) ("[I]n determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals.").  Paragraph 45 does not assert what defendants did or failed to do as to any particular decedent.  Absent an allegation of personal involvement in acts or failure to act in a fact specific situation, Paragraph 45 and fails to overcome defendants' qualified immunity.  *Dudley v. Angel*, 209 F.3d 460, 462 (5th Cir. 2000).

> **Paragraph 51:  "...Even though the existing policies were obviously inadequate, Thaler, Stephens, and Eason continued to follow the same deadly course of conduct.  Air conditioning the Gurney Unit or other prisons was never even discussed. Nor was moving individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons discussed or implemented."**

Despite litigation on prison conditions in a class action suit that resulted in a federal court virtually in control of the Texas Prison System for a period of 27 years, not even Judge William Wayne Justice, in an 89-page opinion, saw fit to order that all prison units be equipped with air conditioning.  *Ruiz v. Johnson,* 37 F.Supp.2d 855 (S.D.Tex.,1999) reversed *Ruiz v. Johnson*, 178 F.3d 385 (5th Cir.1999).  Other than complaining about the lack of air conditioning, Plaintiffs identify no policy that was supposedly inadequate.  Plaintiffs do not identify the "deadly course of conduct" that any of these defendants engaged in.  In a conclusory manner, it is alleged that defendants did not move some unidentified "individuals with heat-sensitive medical conditions or disabilities to air-conditioned prisons..."  Plaintiffs do not allege that any defendant was aware of the medical conditions of any of their decedents, that any defendant had sufficient medical qualifications to order any particular action as to any decedent based on a medical condition or that any of the defendants' job duties included making medical reviews or ordering housing assignments.  Plaintiffs do not allege that these defendants were employees of or assigned to the Gurney Unit where decedents died or that their duties at TDCJ required them to become or be aware of every medical condition that an inmate might have at every facility or to move prisoners of that facility in a manner consistent with their medical status.  Administrators far removed from the day to day operations of prison units may not be held liable on the basis of acts of omissions of the medical and correctional staff who are on the scene and have personal knowledge of the facts and circumstances of events leading to an injury.  *Blackmon v. Kukua, et al*, 758 F.Supp.2d 398 (S.D.Tex.,2010).  (Opinion attached as **Exhibit 1**).

> **Paragraph 52.  " Nor did Executive Director Livingston take steps to cool the non air-conditioned prisons – even though prisoners continued to die from extreme temperatures over several years. In fact, even today Livingston has taken no action to upgrade TDCJ's facilities to protect inmates from these deadly conditions."**

Plaintiffs do not identify the "steps" that were constitutionally required to have been taken or the "action to upgrade TDCJ's facilities" that no similarly situated TDCJ or CID Director could have reasonably failed to undertake.  This allegation is wholly conclusory, imparts no facts nor sets out a violation of clearly established law.  Alleging that defendants should have done something and did not does not overcome immunity.  Paragraph 52 omits any specific facts supporting a finding that defendants are not entitled to qualified immunity. It fails to identify the needs of decedents, that defendants were aware of such needs prior to their death and had the knowledge, qualification and duty to act based on their TDCJ job assignment.  Conclusory statements that cast blame devoid of any underlying facts or showing personal involvement do not overcome qualified immunity. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009).

> **Paragraph 57.  "Though extreme indoor temperatures at the Gurney Unit in the summer are well known to TDCJ and UTMB officials, TDCJ's leadership, including Eason, Stephens, Thaler, and Livingston, has taken no steps to air condition prisoner housing areas at the Gurney Unit."**

> **Paragraph 59.  " Moreover, Defendants TDCJ, Livingston, Thaler, Stephens, Eason and Miller have chosen not to take such action even though they know many prisoners have medical conditions that make the extreme heat deadly."**

> **Paragraph 60.  "There are some parts of the Gurney Unit where prisoners could live, at least until they receive the critical intake physical to identify which prisoners suffer from heat-sensitive medical conditions. But TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason, Goings, Miller and Murray, do not take any steps to house prisoners with heat-sensitive conditions in those areas."**

There is no constitutional duty to air condition a prison.  Plaintiffs do not say what "steps" Livingston, Thaler or Stephens should have taken.  A literal step is putting one foot ahead of the other, known as walking.  Using the term "steps" as a way to suggest that defendants should have done something that is not required by the U.S. Constitution communicates no facts that  meet the

requirement that defendants acted or failed to act in violation of clearly established law under the circumstances presented.  Alleging that the Executive defendants were generally aware that "many prisoners have medical conditions that make the extreme heat deadly" provides no basis for relief as to any of the Plaintiffs' decedents.  This is not a class action.  Plaintiffs may not base liability on any acts or failure to act that allegedly may have harmed unidentified inmates not parties in this case.

General allegations that a defendant violated a person's constitutional rights or failed to act in some unspecified manner, especially when that defendant is not alleged to have knowledge of or personally involved in any of the events that allegedly harmed Plaintiffs, must be disregarded as failing to have pled facts that overcome qualified immunity.  ("...if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of Harlow...It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant sense:  The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violated that right.")  *Anderson v. Creighton*, 483 U.S. 639-40(1987).

> **Paragraph 65.  "The Executive Defendants also chose not to provide prisoners at the Gurney Unit, including Mr. Hudson, Mr. James, and Mr. Adams, opportunities to cool off in an air-conditioned environment. Though some parts of the Gurney Unit are air conditioned and available to use as a respite area, such as the visitation rooms, prisoners were not given a chance to cool off."**

The Gurney Unit in Palestine is 92 miles away from the defendants' offices in Huntsville, Texas.[4]  Below the TDCJ Executive defendants-The TDCJ Director Livingston and the Directors of the Correctional Institution Division(CID), Thaler and Stephens-there are numerous subordinate

---

[4]        http://www.mapquest.com/?version=1.0&hk=5-F0kidWWK

TDCJ employees to whom have been delegated the duty of the day to day running of the Gurney prison unit: The Deputy Director for Prison and Jail Operations, the Regional Director that includes the Gurney Unit, the Warden,  correctional, medical staff and contract staff of the Gurney Unit charged with making day to day operations, classification , assignment and other decisions related to the care and supervision of the offenders[5]. There is a Deputy Director for Management Operations that includes tiers of training administrators.  *Id*.  In addition, there is another organizational branch below these defendants titled Deputy Director, Support Operations that includes classification of inmates as well as a branch that is entitled Chief Financial Officer below which is the Facilities Division Director.  *Id*.  As would be expected, if a toilet breaks at the Gurney Unit or one of the fans breaks down and needs to be repaired or replaced, a Gurney Unit sergeant is not going to call the TDCJ Director Brad Livingston or the CID Directors, Stephens and Thaler and ask them to "take steps" to fix it.  The Gurney Unit personnel consists of 307 security personnel, 82 non-security staff, 9 Windham Education employees and 30 contract medical staff supervising a maximum capacity of 2128 inmates. [6]  Plaintiffs do not allege that Livingston, Thaler or Stephens had any involvement in the day to day operations of the Gurney Unit, that they had ever made a single housing assignment at that unit or that their job duties included reviewing the medical or other needs of the Plaintiffs' decedents or any other inmate at the Gurney Unit.  Without any factual or legal basis, Plaintiffs assert in a conclusory manner that Executive TDCJ officials officed in Huntsville, Texas "chose not to provide" plaintiffs' decedents with "opportunities to cool off in an air-conditioned environment." When Plaintiffs' Amended Complaint is not in the process of  making up scenarios divorced from reality designed to suggest, without facts, that the Executive defendants were somehow involved in

---

[5]     http://www.tdcj.state.tx.us/documents/executive_services/Org_Structure_FY2011.pdf.

[6]     http://www.tdcj.state.tx.us/unit_directory/nd.html

the monitoring, supervision and care of the decedents, they admit that there were actual correctional and medical staff at the Gurney Unit that had direct contact with and supervisory responsibility over inmates at that facility, including the 18 co-defendants named in this case. The conclusory suggestion that administrators in Huntsville, Texas should be making medical, housing assignment and other judgment calls on how to handle inmates in medical distress instead of the correctional and medical staff that have personal knowledge, medical training and access to medical facilities and records located therein and that such failure to do so violates clearly established law traverses the outer limits of common sense and legal precedent.   In fact, the opposite is true-It would be objectively unreasonable for TDCJ officials in Huntsville to substitute their judgments as to the medical care, treatment or housing assignment of inmates over the judgment of the medical and correctional staff at the scene, possessed with personal knowledge, medical training and whose job responsibilities and proximity put them in the best position to make such calls.   The conclusory speculations that the Executive defendants lose their qualified immunity because they should have taken "steps" to intervene in the care and treatment of the decedents does not survive a motion to dismiss. *Blackburn v. City of Marshall*, 42 F.3d 925, 931 (5th Cir. 1995); *Bell Atlantic v. Twombly*, 127 S. Ct. 1955, 1964 (2007).

> **Paragraph 73. "TDCJ and UTMB officials, including Livingston, Thaler, Stephens, Eason, Goings, Miller, and Murray know prisoners in TDCJ custody suffer from these disabilities, and are at increased risk of heat-related injury."**

Imputing such knowledge to Thaler, Livingston and Stephens does not state a claim against them as to any of the decedents named in this Amended Complaint.   General knowledge that some unidentified TDCJ prisoners are at an increased risk of heat related injury cannot form the basis of a finding of a constitutional violation.   Plaintiffs do not allege that these defendants had medical training, were on the scene and were aware of the needs of the Plaintiffs' decedents or in any way

show that they had a constitutional duty to override the judgments and acts of the correctional and medical staff 92  miles away at the Gurney Unit-staff whose duties consist of observing inmates, reviewing their records, and taking action based on their training and experience.   Qualified immunity is not overcome by unsupportable, non specific, conclusory allegations that ignore on the scene facts and circumstances that the Amended Complaint sets out in detail, but ignores when making allegations against the Executive defendants. *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (To overcome immunity, specific facts must be set out demonstrating that defendant's conduct violated a clearly established right under the circumstances faced by the official)

> **Paragraph 89. "To put it simply, TDCJ officials, like Eason, Thaler, Stephens, Miller, Goings, Murray and Livingston, know that TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions and know that this failure endangers prisoners, yet they have done nothing to correct it."**

Here, Plaintiffs seek to overcome Thaler, Livingston and Stephens' immunity by asserting they failed to "correct" TDCJ and UTMB's failure to identify heat susceptible prisoners.  Knowledge of a failure to act by another defendant which might endanger some unidentified prisoners does not set forth facts that would overcome the Executive defendants' immunity under the facts and circumstances alleged in the Amended Complaint.  This claim seeks to attribute medical knowledge, training and medical diagnostic abilities on non medical administrators that are not qualified to second guess the decisions of doctors or nurses.  To conclude that this allegation demonstrates a violation of clearly established law, a court would have to ignore that the Executive Defendants were not based at the Gurney Unit, had no personal knowledge or observations of the inmate decedents, had no medical training or an opportunity or duty to assess, treat, assign or in any other way, supervise the decedents' housing and medical needs.  Personal involvement by a co-defendant alleged to cause constitutional injury has never been held by a court in the Fifth Circuit to form a basis for overcoming the immunity of defendants that had no hand in any of the decisions made

leading to the injury complained of. *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 381(5th Cir.2005) (Supervisory officials cannot be held liable under § 1983 for the actions of subordinates on any theory of vicarious or respondeat superior liability; rather, supervisors can only be held liable when their own conduct denies claimant's constitutional rights):

> With respect to the third prong, we have on several occasions reversed a district court's denial of qualified immunity, persuaded that support was lacking for a conclusion of deliberate indifference on the part of a supervisor.FN26 " '[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."FN27 "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."FN28 Deliberate indifference requires a showing of more than negligence or even gross negligence. *FN29* "Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and do not divest officials of qualified immunity." *Citing Alton v. Texas A&M University*168 F.3d 196 (5th Cir.1999)

> **Paragraph 93. "The Executive Defendants and UTMB made this decision for financial reasons, despite knowing it placed inmates at risk during the evening and the middle of the night, and at grave risk in emergency situations where medical care was immediately needed."**

Paragraph 93 claims that the private emergency medical service used by non incarcerated citizens activated by 911 and used to provide medical care to inmates between 6:00 p.m. and 9:00 a.m. violates the Constitution. They make this claim, while admitting in paragraphs 91 and 92, that inmates may be examined and treated for medical concerns between 6:00 p.m. and 9:00 a.m. by medical staff at the nearby Beto Unit in addition to the use of a local hospital's staff and facilities. No court in the 5th Circuit has ever held that use of the 911 system to access a local private medical hospital for care, used daily by millions of free world people in these United States, violates clearly established law, when a correctional facility relies on it to provide medical care to its inmates. The claim that on site prison medical services are constitutionally required and that the Executive

Defendants can be found to be deliberately indifferent to inmate medical needs by providing two alternate methods of medical care, including the 911 system that the general public uses on a routine basis is not supported by 5th Circuit precedent. The 9th Circuit has concluded just the opposite- medical care provided to a prisoner comparable to a community standard does not violate the Constitution. *Dixon v. Howe*, 44 Fed.Appx. 274, 2002 WL 1891419 *1 (9th Cir. 2002) ["Dixon failed to present evidence to refute defendants' contention that the delay he experienced was comparable to that typical in the medical community. See, *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989)"].

> **Paragraph 98. "As the wardens and regional director, respectively, Miller, Goings and Eason are directly responsible for training the front-line officers charged with protecting prisoners' lives. Livingston, Thaler, and Stephens are ultimately responsible for ensuring all TDCJ corrections officers receive adequate training. Each failed to provide meaningful training, and many people died as a consequence."**

"Ultimately responsible" is a respondeat superior argument. It asserts that employees subordinate to Livingston, Thaler and Stephens are directly responsible for training front line officers and that the Executive Defendants should be liable for the actions of such subordinates because they "are ultimately responsible". Government officials may not be held liable, under § 1983, for unconstitutional conduct of their subordinates under respondeat superior because vicarious liability is inapplicable. *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 173 L. Ed. 2d 868, 73 Fed. R. Serv. 3d 837 (2009). *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir.2008) (reiterating "the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care").

> **Paragraph 106. Douglas Hudson suffered a heat stroke on July 24, 2011 at the Gurney Unit. When he received medical attention at the prison his body temperature was 105 degrees. He was eventually taken by ambulance to Palestine Regional Medical Center, but died on July 25, 2011.**

**Paragraph 107.  A few days later, an email was sent to Gurney Unit employees, including Miller, Goings, Leonard, Matthews, Gilmore, Washington, Seda, Flowers, Edwards and Dodd, informing them "it is imperative that we take an aggressive proactive approach to the heat related issues we are currently facing due to the extreme temperatures." Despite this recognition of the life-threatening situation at the prison, Livingston, Thaler, Stephens, Eason, Miller and Goings failed and refused to make any changes to protect prisoners' lives at Gurney.**

**Paragraph 113.  "On August 13, 2011, Mr. James died at the Gurney Unit. Once again, as after prior deaths, Livingston, Thaler, Stephens, Eason, and Miller failed and refused to make changes necessary to prevent heat deaths."**

**Paragraph 116.  " Livingston, Thaler, Stephens, Eason, Miller, Going, Murray, TDCJ and UTMB knew indoor temperatures in TDCJ facilities regularly exceeded 95 degrees during the hot Texas summers, but failed and refused to take reasonable steps to protect the health and safety of prisoners."**

**Paragraph 137.  UTMB, TDCJ, Livingston, Thaler, Stephens, Eason, Goings, Miller, and Murray – at a minimum – callously failed and refused to take reasonable steps to safely house prisoners at the Gurney Unit and protect them from heat stroke, a risk they were well aware of at the time. Livingston, Thaler, Stephens, Eason, Goings, and Miller were deliberately indifferent to the extremely dangerous conditions caused by heat in TDCJ facilities.**

**Paragraph 138.  Despite the epidemic of heat-related deaths, the Executive Defendants have refused to act, authorize or otherwise approve actions to address these conditions.**

These paragraphs attempt to base liability of the Executive defendants on knowledge of "hot Texas summers", on the failure of other employees to respond to an email and because they "refused to act".  It is alleged they "refused to make any changes to protect prisoners' lives at Gurney" or "to take reasonable steps", but does not state what steps or changes the Executive Defendants should have made or were constitutionally mandated.  It is not even alleged that these unidentified omissions  caused the death of Adams, Hudson or James-the Plaintiffs' decedents.

Failure to take an "aggressive proactive approach" or "refused to make any changes" and "refused to take reasonable steps" are broad conclusory phrases that assert no facts and lack the specificity necessary to overcome qualified immunity. *Iqbal*, 556 U.S. at p. 664. (" A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth.")

> **Paragraph 117. "And Livingston, Thaler, Stephens, Eason, Goings, Miller and Murray all knew inmate living areas at the Gurney Unit were not air conditioned and that the apparent temperatures routinely skyrocketed during the hot Texas summers and routinely exceeded 100 degrees indoors."**

Concisely put, it is alleged that defendants knew it gets hot in the summer and that the Gurney Unit was not air conditioned. From 1972 to 1999, District Judge William Wayne Justice litigated TDCJ prison conditions and authored numerous opinions including the 89 page opinion in *Ruiz v. Johnson*, 37 F.Supp.2d 855 (S.D.Tex.,1999). He did not find a constitutional right to air conditioning in Texas prisons. Neither has any other Court within the Fifth Circuit. *Blackmon v. Kukua, et al*, 758 F.Supp.2d 398 (S.D.Tex.,2010). The Amended Complaint alleges as unconstitutional the very methods approved by the Fifth Circuit in *Gates v. Cook*, 376 F.3d 323,339-40 (5th Cir. 2004) and relied on by defendants in their policies. *Gates v. Cook*, 376 F.3d 323,339-40 (5th Cir. 2004). Therein, the district court entered numerous injunctions, including one that "direct[ed] [the prison officials] to provide fans, ice water, and daily showers when the heat index is 90 degrees or above, or alternatively to make such provisions during the months of May through September." The Fifth Circuit affirmed this injunction. Also see *Valigura v. Mendoza*, 265 Fed.Appx. 232, 235 (5th Cir. 2008) (finding the necessity of remedial measures, such as fans, ice water, and showers to mitigate extreme heat, if appropriately employed, constitutionally sufficient and making no finding that air conditioning is constitutionally required). . *Woods v. Edwards*, 51

F.3d 577 (5th Cir.1995) ( mere allegations of high temperatures in a lockdown cell could not support

a claim that an inmate was subjected to cruel and unusual punishment).

Cases compiled from all federal circuits *in Rights of Prisoners § 3:56 Temperature and*

*ventilation,* Michael B. Mushlin (4th ed. October 2012) do not disclose one case finding a

constitutional right of a prisoner to air conditioning.

> **Paragraph 118. "Livingston, Thaler, Stephens, Eason, Miller, Goings, and Murray knew that extreme temperatures can be deadly.  But they, as well as UTMB, also knew TDCJ routinely housed people with hypertension and depression in extremely hot facilities like the Gurney Unit. TDCJ's policies and practices, which Livingston, Thaler, Stephens, Eason, Goings, Miller, and Murray implemented (and could have changed), make no accommodation for people with hypertension or depression during periods of extreme temperatures."**

Plaintiffs recognize that medical supervision, assignment and care duties are the

responsibility of medical professionals.  Amended Complaint, paragraphs 53, 54:

> **Paragraph 53.   "...Dr. Murray is responsible for ensuring that TDCJ facilities serviced by UTMB provide adequate health care to prisoners, that prisoners have access to adequate health care, that infirmaries at units, including the Gurney Unit, are adequately staffed to handle medical conditions and emergencies that occur, and for formulating policies to ensure that prisoners receive adequate care, that serious medical needs are not treated with deliberate indifference, and that prisoners are not subjected to dangerous conditions as a consequence of their health issues and medical needs."**

> **Paragraph 54. "Despite having this responsibility, Dr. Murray, on behalf of UTMB, has been grossly derelict and deliberately indifferent when it comes to protecting inmates vulnerable to the heat.  In fact, Dr. Murray knows that extreme heat above 90 degrees indoors is harmful medically and potentially lethal to prisoners suffering from hypertension, depression, mental illness, and who are over forty years of age. Likewise, Dr. Murray, as the chief physician for UTMB concerning correctional care, knows that prisoners with such conditions are endangered if placed into brutally hot conditions."**

Plaintiff's conclusory allegations that TDCJ's executives should have second guessed or over ridden the on the scene assessments of correctional and  medical staff, including doctors of medicine fails to overcome these defendants' qualified immunity.  *Lee v. Young*, 533 F.3d 505, 511 (7th Cir.2008) ("[I]n determining the best way to handle an inmate's medical needs, prison officials who are not medical professionals are entitled to rely on the opinions of medical professionals."). Imputing  knowledge and medical awareness of the significance of hypertension and depression and heat susceptibility to assign liability to TDCJ executives, without stating personal involvement, medical qualification or job assignment responsibility, or  knowledge of the specific circumstances of decedents in the one to four days of custody prior to death is a vicarious liability claim not recognized as a basis for liability under 42 U.S.C. 1983.  *Iqbal, supra.*

> **Paragraph 122.  "Additionally, Eason, Miller, Goings, Thaler, Stephens, and Livingston are aware that daily temperature readings are taken at the prison and that these readings are routinely above 90° at all times during the summer months. Incredibly, despite their knowledge of these dangers, TDCJ has no policy concerning protecting prisoners from extreme heat in indoor housing areas, and no policy to cool the dangerously hot living areas."**

Aside from alleging that the Executive defendants should have air conditioned all 112 TDCJ units[7], Plaintiffs' do not assert what policy TDCJ should have had or demonstrate how that policy or lack thereof directly caused the deaths at issue in this case.  Although the Amended Complaint formulaically labels TDCJ polices "inadequate", it acknowledges that TDCJ did have informal policies and procedures in place for dealing with prison heat:

> **Paragraph 123.  Instead of having a formal policy, TDCJ relies on an informal email discussing the extreme temperatures indoors.  But while this email acknowledged the dangers of heat to prisoners, it does not provide for any way to protect a prisoner with   heat-sensitive   medical   conditions   from   extreme**

---

[7]    http://www.tdcj.state.tx.us/unit_directory/

**temperatures. Instead, it relies on measures proved inadequate when men died in 2007, like increasing water intake and providing additional fans, neither of which occurred at the Gurney Unit.**

**Paragraph 124. Stephens and Thaler claim to send the email in May of each year to remind wardens and regional directors to begin to take heat-safety precautions. The email is recycled each year – the text is virtually identical, and has not changed even when men began to die. Livingston, Thaler, Stephens, Eason, Goings and Miller know the measures described in the email are inadequate, but have taken no action to improve TDCJ's response to heat-related emergencies.**

By use of sophistry, the Amended Complaint, paragraph 123 identifies TDCJ policies "like increasing water intake and providing additional fans", states that such "measures proved inadequate" and after admitting the existence of such policies, magically disappears those policies by claiming in paragraph 122 that "TDCJ has no policy concerning protecting prisoners from extreme heat in indoor housing areas".

It is easy to discern that the substance of the Amended Complaint is based on medical and operational decisions made by on the 18 on the scene medical and correctional staff assigned to supervise, classify, treat and otherwise respond to inmate health requirements, including responding to heat related distress and illness based on their personal interaction, knowledge and circumstances of each inmate. Paragraph 156 ("When he arrived in the infirmary, UTMB employees failed to treat Mr. Hudson, or even do a cursory examination"); Paragraph 89 (" TDCJ and UTMB fail to immediately identify prisoners with heat-sensitive medical conditions"); Paragraph 157 ("No UTMB official checked his vitals, or in any way evaluated him before he left the infirmary, despite his obvious need for medical care."); Paragraph 162 ("Instead of immediately calling 911, Betts and Fields told the officers to bring Mr. Hudson to the Beto Unit for evaluation, even though they knew he was suffering convulsions, suffered from hypertension and depression, had stopped responding

to officers, and was 'very hot.'"); Paragraph 152. ("Mr. Hudson suffered from depression and hypertension.  Dr. Joe Oliver prescribed him Elavil (amitriptyline), a tricyclic antidepressant, and Lopressor (metoprolol), a beta-blocker, to treat his disabilities.  Dr. Oliver knew UTMB policy recognizes prisoners taking Lopressor are at heightened risk of heat stroke.  Likewise, Oliver also had actual knowledge patients taking tricyclic antidepressants are at greater risk of heat stroke.").  See Paragraphs 153-165 criticizing the judgments, responses and actions of Gurney Unit medical and correctional staff present at the scene in the days and hours preceding the deaths at issue.  However, prison administrators may rely on the professional medical staff's decisions on how to provide, treat, classify and respond to inmate health problems without waiving their qualified immunity.  *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir.2008) (reiterating "the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care").

> **Paragraph 126. "...Livingston was a named defendant in *Blackmon v. Kukua*.  In *Blackmon*, Livingston filed an answer making specific admissions and denials in April 2010, and admitted "the dorm areas where the inmates are housed [at Mr. Blackmon's prison] are not air conditioned."  Mr. Blackmon complained he was exposed to apparent temperatures that reached 130° indoors at the Garza East Unit, another TDCJ transfer facility.  *Blackmon* went to trial in February 2011, just a few months before men began dying at the Gurney Unit.**

Claims alleging TDCJ Director Livingston to be liable for heat related injury to a TDCJ inmate were brought in *Blackmon v. Kukua, et al*, 758 F.Supp.2d 398 (S.D.Tex.,2010).  (Opinion attached as **Exhibit 1**).  The Complaint alleged that Livingston violated Blackmon's rights under the Eighth and Fourteenth amendments by knowingly subjecting him to inhumane levels of heat during his time in East Garza and by acting with deliberate indifference to Blackmon's health and safety.  Blackmon contended that from May to October the indoor temperature at Garza East ranged from 88 to 104 degrees Fahrenheit.  Blackmon alleged that "the administration building, control pickets,

and other areas where prison employees worked were all air conditioned.  (*Id.* at 27, 50-56.)  The windows in the dorm were sealed shut."  Opinion, p. 3.

Similar to the present Plaintiffs' allegations, Blackmon alleged the absence of air conditioning and personal fans:

> The main ventilation in the East Garza dorms came from air handlers that brought in air from outside and circulated it through the dorms, but provided no conditioned air.  (*Id.* at 42.)  Each air handler served two dorms.  (*Id.* at 39.)  Garza East inmates were not permitted to have personal fans because there were not enough electrical outlets in the dorm for the inmates to use.  There was no water fountain in the dorm. Ice water was made available three times daily (though the water may have run out on some occasions).  (*Id.* at 22.)  Offenders were also served iced water and/or beverage at all three meals in the offender dining room.  (D.E. 141, Ex. H (Frances affidavit) at 2).  But, according to Blackmon, thirsty prisoners were often forced to drink from one of the restroom sinks.  (D.E. 142, Ex. A (Blackmon Decl.) at ¶19.)  There were eight sinks for up to 54 prisoners, but many were often broken.

Opinion, p. 3

Blackmon, like the present Plaintiffs, alleged that due to his medical condition, the heat had exacted a higher toll on his health than on an inmate without his medical condition, that Livingston did not personally take action to limit his exposure and that he suffered a constitutional injury for which Livingston is liable:

> Blackmon contends that prolonged exposure to high temperatures and humidity threatened the physical and mental health of inmates at Garza East.  (D.E. 120 at 4-5.)  Blackmon himself suffers from hypertension for which he takes medication.  (D.E. 142, Ex. A (Blackmon affidavit), ¶ 25.)  He contends that his age and medical condition put him at acute risk of heat stroke, and that his blood pressure rose and his vision dimmed and became blurry as a result of the heat.  (*Id.* at ¶¶ 27-29.)  Blackmon further contends that Defendants were well aware of these conditions and did nothing to alleviate them, even after Blackmon wrote several grievances to Defendants regarding the heat conditions and the broken sinks.

Opinion, pp.3-4

In analyzing Livingston's Motion for Summary Judgment, the Court found that extreme heat can be the basis of an 8th Amendment violation and that there was a genuine issue of material fact as to whether the conditions Blackmon complained of constituted cruel and unusual punishment citing *Valigura v. Mendoza*, 265 Fed.Appx. 232, 235 (5th Cir. 2008):

> "[w]e have held that temperatures consistently in the nineties without remedial measures, such as fans, ice water, and showers, sufficiently increase the probability of death and serious illness so as to violate the Eighth Amendment."
>
> ...
>
> Upon review of the legal standards and the summary judgment evidence, the Court finds Blackmon has succeeded in raising a genuine issue of fact as to whether the conditions in the C-8 Dorm constituted an "extreme deprivation of any 'minimal civilized measure of life's necessities.'" *Gates,* 376 F.3d at 332.  Blackmon has provided sufficient evidence of the extreme temperatures he suffered in the C-8 Dorm.

Opinion, pp.12-13

The court next analyzed which defendants could be shown to be deliberately indifferent to his health and safety because they had knowledge of the complained of conditions, finding "...that Defendants Warden Kukua, Assistant Warden E. Garza, Maintenance Supervisor M. Garza, and Captain Latorre all had knowledge of Blackmon's complaints."  Opinion, p. 17

As to defendant TDCJ Director Brad Livingston, the Court found that it had not been established that he knew about Blackmon's complaints.  Opinion, pp. 17-18.[8]

---

[8]     Plaintiffs in the case at bar have made no allegation that any of the Executive Defendants were notified of decedents'  medical condition, that they had medical training that would have put them on notice that due to decedents' medical history, they required additional care, or that these defendants had personal knowledge or on the scene job duties requiring them to respond in a manner medically necessary to preserve their health.

In granting Livingston's Motion for Summary Judgment, the Court concluded:

> The summary judgment evidence does not show, however, that Defendant Brad Livingston, Executive Director of the TDCJ, knew about Blackmon's complaints, let alone that he took any action with respect to them.  The Fifth Circuit has held that supervisory officials are not liable under §1983 unless "there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  *Thompkins v. Belt*, 828 F.2d 298, 303-304(5th Cir. 1987) (citing *Harvey v. Andrist*, 754 F.2d 569, 572 (5th Cir. 1985)).  Supervisory liability can also result if supervisory officials implement a policy so deficient that the policy "itself is a repudiation of constitutional rights" and is "the moving force of the constitutional violation." *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978)).
>
> Under these standards, Plaintiff cannot support an individual claim against Executive Director Livingston based simply on the fact that Blackmon filed grievances with officials at Garza East and that those officials failed to act.  *See, Kidd v. Livingston*, 2010 WL 2208247, (E.D.Tex., May 26, 2010) ("The fact that [defendants] did not take the action on [plaintiff's] grievances which [plaintiff] thought appropriate does not show that a constitutional violation took place.  Nor does every letter or grievance written by an inmate to the Executive Director of TDCJ or the Director of the Correctional Institutions Division of TDCJ give rise to personal liability on the part of that official if the letter is not acted upon in the manner which the inmate believes appropriate.")  As such, Defendants' motion for summary judgment with respect to Livingston is granted.

Opinion pp. 17-18

> For the reasons discussed above, Defendants Latorre, M. Garza, and Livingston are entitled to qualified immunity to the extent that they could be found liable under the Eighth Amendment at all.

Opinion, attached as Exhibit 1, at p. 23

> **Paragraph 139.  " At the time of the deaths of Mr. Hudson, Mr. James, and Mr. Adams, the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement.**

**Thus, Livingston, Thaler, Stephens, Eason, Goings, Miller, and Murray are not entitled to qualified immunity."**

At this level of generality, Plaintiffs' claims are constitutionally meaningless.  Reciting that a temperature of 90 degrees or above at a Texas prison violates the Constitution, without specifying facts that demonstrate a particular defendant engaged in conduct prohibited by clearly established law does not remotely challenge these defendants' qualified immunity.  *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 3039 (1987):

> Qualified immunity depends substantially upon the level of generality at which the relevant "legal **3039 rule" is to be identified.  For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right.  Much the same could be said of any other constitutional or statutory violation.  But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading.  Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." *640 Davis, *supra*, 468 U.S., at 195, 104 S.Ct., at 3019.  FN2 It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.

Recitals of the elements of a cause of action, supported by mere conclusory statements devoid of factual specificity, asserting that "the law was clearly established that temperatures exceeding 90 degrees Fahrenheit are cruel and unusual, and create unconstitutional conditions of confinement" do not suffice to overcome qualified immunity.  The mere existence of an unconstitutional condition

does not suffice to state a claim against a defendant, solely because that defendant is employed by the prison system or because subordinates' conduct might have created that condition. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949-50 (2009):

> respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a Bivens action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.  37

Broad, sweeping allegations that the Executive defendants are aware that high temperatures can lead to health problems are not sufficient to show a violation of clearly established law.  An attempt to attribute personal liability and overcome the qualified immunity of the chief Executives of TDCJ, an agency that incarcerates 152,303 inmates and supervises 671,886 more, must do more than allege that if air conditioning or some other policy had been in place, Plaintiffs' decedent would not have been injured.[9]

> **Paragraph 167.  Thus, UTMB and TDCJ's decision to take Mr. Hudson to the Beto Unit in the hot transport van dropped him from the frying pan into the fire.  This deliberate policy decision made at the highest levels of the organization by the Executive Defendants placed Mr. Hudson in obviously dangerous conditions, and discriminated against him and other prisoners with heat-sensitive disabilities.**

The allegation that the Executive defendants-Livingston, Thaler and Stevens, situated in Huntsville, Texas 92 miles from Palestine, made a decision, by policy or otherwise, "to take Mr. Hudson to the Beto Unit in the hot transport van**"** is speculatively implausible and contradicted by

---

[9]        http://www.tdcj.state.tx.us/documents/Statistical_Report_FY2012.pdf

Paragraph 162.  It was not the Executive defendants but two Beto Unit nurses that ordered that Hudson be transported to Beto for a medical assessment:

> **Paragraph 162.  Pursuant to TDCJ and UTMB practice and policy, the officers called the UTMB medical staff at the nearby Beto Unit.  The officers told two licensed vocational nurses at the Beto Unit, Nancy Betts and L. Fields, that they believed Mr. Hudson's condition was "heat related" because "he is very hot." Instead of immediately calling 911, Betts and Fields told the officers to bring Mr. Hudson to the Beto Unit for evaluation, even though they knew he was suffering convulsions, suffered from hypertension and depression, had stopped responding to officers, and was "very hot."**

Paragraph 162 premises liability on the acts of correctional officers in calling medical staff for advice and for medical staff providing advice, which they acted on.  Are we to believe that it is a constitutional violation for a corrections officer to call a TDCJ unit nurse to advise them that an inmate is in distress?  Or are we to believe that nurses requesting that a distressed inmate be brought to them for examination and treatment violate clearly established law?  Or are we to believe that having the policy described in paragraph 162, is unconstitutional? ("Pursuant to TDCJ and UTMB practice and policy, the officers called the UTMB medical staff at the nearby Beto Unit.")  Is it clearly established law that correctional officers may not ask medical staff for advice or act upon that advice when confronted with an ill inmate?

This paragraph seems to assign liability to the Executive Defendants on respondeat superior and a failure to override medical and correctional personnel decisions, of which they were unaware. How could the Executive defendants make decisions as to events they were unaware of and that if they had been aware of, would have had to defer to the vocational nurses' request that Hudson be brought to them for evaluation? *Hayes v. Snyder,* 546 F.3d 516, 527 (7th Cir.2008) (reiterating "the presumption that non-medical officials are entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care.").

**Paragraph 214. "By subjecting Mr. Hudson, Mr. James, and Mr. Adams to these extreme conditions of confinement, specifically excessive heat, with full knowledge of the dangerousness of those conditions, Defendants Livingston, Thaler, Stephens, Eason, Goings, Miller, and Murray acted with deliberate indifference to the deceased men's serious health and safety needs, in violation of their rights under the Eighth and Fourteenth Amendments to the United States Constitution."**

**Paragraph 216. "The Executive Defendants failure to stop these dangerous practices (all of which they actually knew of at the time of the decedents' deaths at the Gurney Unit) endangered the decedents and violated their rights under the Eighth and/or Fourteenth Amendments to the United States Constitution, proximately causing the deaths of Plaintiffs' decedents."**

These allegations are of the type that federal courts have repeatedly held lack the specificity necessary to overcome qualified immunity. In *Iqbal, supra,* the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the Court should identify and disregard conclusory allegations for they are "not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 664. Second, the Court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief."

Plaintiffs' claims in this case do not survive the first prong analysis because they are conclusory in the manner held insufficient in *Iqbal,* 129 S. Ct. at 1951:

> We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint ¶ 96, App. to Pet. for Cert. 173a-174a. The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, id., ¶ 10, at 157a, and that Mueller was "instrumental" in adopting and executing it, id., ¶ 11, at 157a. These bare assertions, much like the pleading of conspiracy in Twombly, amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U.S., at 555, 127 S.Ct. 1955, namely, that petitioners adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Feeney,* 442 U.S., at

279, 99 S.Ct. 2282.  As such, the allegations are conclusory and not entitled to be assumed true.  *Twombly*, *supra*, 550 U.S., at 554-555, 127 S.Ct. 1955.  To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in *Twombly* rejected the plaintiffs' express allegation of a " 'contract, combination or conspiracy to prevent competitive entry,' " *id*., at 551, 127 S.Ct. 1955, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth. (explaining that although the Court must "take all of the factual allegations in the complaint as true," it is "not bound to accept as true a legal conclusion couched as a factual allegation"

A fair reading of the Amended Complaint reveals numerous medical professionals and TDCJ security staff that has personal involvement with Hudson, Adams and James in the one to four days between their arrival at the Gurney Unit and the date of death, including 18 co defendants in this case.  To permit a case to go forward against the chief TDCJ Executives on the basis of broad, conclusory allegations and on decisions made by medical professionals and correctional staff on the scene directly and personally involved in the treatment and care of three of 152, 303 inmates, in 112 Units under their general supervision, where they had no previous knowledge of their medical history or their circumstances, absent  personal involvement in any of the medical or classification/housing assignment decisions made during the one to four day period between the decedents' arrival at Gurney and death, is not supported by clearly established law.[10]   Qualified immunity may not be compromised on the basis of respondeat superior, especially when the on the scene officials alleged to be personally involved in the treatment and care of Plaintiffs' decedent are medical professionals and the defendants are not.

---

[10]      Hudson died on July 25, 2011.  James died on August 13, 2011.  Adams died on August 3, 2012 . Amended Complaint, p. 15, paragraph 46.  They had been at the Gurney Unit for four (4), three (3) and one (1) days respectively at the time of death. Page 23, paragraphs 78, 79, 80.

Plaintiffs' claims against these defendants assert no facts demonstrating personal involvement in any of the matters complained about and are insufficient to state a claim for relief. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) and *Pearson v. Callahan* 555 U.S. 223, 129 S.Ct. 808 (2009) require a claimant against a public official to assert facts demonstrating that immunity is inapplicable. A court must decide (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Saucier,* 533 U.S. at 201; *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (explaining that claims must offer more than naked assertions devoid of further factual enhancement, and quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *Twombly,* 550 U.S. at 555 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)) (requiring more than "labels and conclusions" or "a formulaic recitation of the elements" in the complaint); The *Morgan v. Swanson,* 659 F.3d 359, 372 (5th Cir. 2011) summarizes precedent on this issue:

> ...the Supreme Court has held that generalizations and abstract propositions are not capable of clearly establishing the law. The Supreme Court recently—and forcefully—underscored this point in *Ashcroft v. al-Kidd,* where it noted, with some exasperation, that it has "repeatedly told courts ... not to define clearly established law at a high level of generality."[FN30]  This rule is eminently sensible, of course, as the Court has explained:

> FN30. *Id.* (citations omitted); *See also, Brosseau v. Haugen,* 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (holding that the clearly-established inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition").

> [T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause ... violates a clearly established right.... But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of [qualified immunity]."[FN31]

FN31.  *See Anderson,* 483 U.S. at 639, 107 S.Ct. 3034.

The Amended Complaint consists of opinion, general, conclusory allegations of unspecified misconduct, devoid of factual allegations showing personal involvement in the treatment, assignment or care of the decedents.  It fails to overcome a public official's qualified immunity from suit or to set out, in a particularized fashion, what objectively unreasonable conduct in violation of clearly established law was violated.  It seeks to hold these defendants liable for the conduct of the 18 co-defendants that dealt directly with the decedents prior to their death.  Despite the generality littered Amended Complaint, the requirement for specificity is so well established as to have been described by the Fifth Circuit as having reached a level of Supreme Court exasperation.  ("The Supreme Court recently — and forcefully — underscored this point in *Ashcroft v. al-Kidd,* where it noted, with some exasperation, that it has 'repeatedly told courts ... not to define clearly established law at a high level of generality.'"")  *Morgan v. Swanson,* 659 F.3d 359, 372 (5ᵗʰ Cir. 2011)

A plaintiff may not rely on conclusory assertions but must allege specific conduct giving rise to an alleged Constitutional violation.  *Baker v. Putnal,* 75 F.3d 190, 195 (5th Cir. 1996).  Plaintiff must "support [her] claim with sufficient precision and factual specificity to raise a genuine issue as to the illegality of defendant's conduct at the time of the alleged acts."  *Florance v. Buchmeyer,* 500 F.Supp.2d 618, 640-41 (N.D. Tex. 2007) (*Schultea v. Wood,* 47 F.3d 1427, 1433-1434 (5th Cir. 1995).  Moreover, " plaintiff must allege facts reflecting the defendants' participation in the alleged wrong, specifying the personal involvement of each defendant."  *Jolly v. Klein,* 923 F.Supp. 931, 943

(S.D. Tex. 1996) ( *Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992).  For a civil rights pleading to survive dismissal, it must chart "... a factual path to the defeat of the defendant's immunity, free of conclusions."  *Schultea*, 47 F.3d at 1430.

## II.  PROTECTION FROM DISCOVERY

Once a defendant has invoked the defense of qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of the defense.  *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002).  The Fifth Circuit has stated that a district court must first find "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012) (citing *Wicks v. Mississippi State Employment Services*, 41 F.3d 991, 994 (5th Cir. 1995).

As the Supreme Court has stated, "[q]ualified immunity is an immunity from suit rather than a mere defense to liability."  *Pearson v. Callahan*, 555 U.S. 223, 237, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).  Because immunity is "effectively lost if a case is erroneously permitted to go to trial," a denial of qualified immunity may be immediately appealed.  *Mitchell v. Forsyth*, 472 U.S. 511, 526–27, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985).  Courts have applied Mitchell to trial court discovery orders that effectively deprive public officials of an immunity from suit.  *Wicks v. Miss. State Emp't Servs.*, 41 F.3d 991, 994–95 (5th Cir.1995):

> One of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive, *Helton v. Clements*, 787 F.2d 1016, 1017 (5th Cir.1986). Consequently, this court has established a careful procedure under which a district court may defer its qualified immunity ruling if further factual development is necessary to ascertain the availability of that defense.  As we explained in *Wicks, supra*, a district court must first find "that the plaintiff's pleadings assert facts which, if true, would overcome the defense of qualified immunity."

Discovery involving these defendants should not proceed prior a ruling on this Motion.

## CONCLUSION

The Fifth Circuit has explained that "conclusory allegations and unsubstantiated assertions" are not sufficient to overcome the qualified immunity defense. *Miller v. Graham*, 447 F. App'x 549, 551 (5th Cir. 2011) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007); *Sylvester v. Cain*, 311 F. App'x 733, 735 (5th Cir., Feb. 20, 2009) (citing *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 469 n.13 (5th Cir. 1990))".

Plaintiff's conclusory allegations speculating that different policies of the TDCJ Executive defendants violated the U.S. Constitution are insufficient to overcome qualified immunity or to demonstrate the violation of clearly established law by reference to specific facts.  For supervisory liability to attach, where the supervisory connection between  TDCJ Executives and the corrections and medical staff whose conduct is sought to be attributed to the Executives, is separated by a chain of command that includes Sergeants, Lieutenants, Captains, Majors and Assistant or Deputy Directors and medical staff, assigned to provide the precise care that Plaintiffs allege was lacking[11], Plaintiffs must allege more than that defendants should have provided air conditioning or "taken steps", "refused to act" or similar meaningless allegations set out in the Amended Complaint. Plaintiff must be able to show a specific policy or custom implemented by the Executive defendants that was the moving force behind the constitutional violation.  *Duvall v. Dallas County, Tex.*, 631 F.3d 203, 209 (5th Cir. 2011).  They must identify the policy , connect the policy to the supervisory defendant and show that her injury was incurred because of the implementation of that administrator's specific policy.  *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir. 1984).

---

[11]     http://www.tdcj.state.tx.us/documents/executive_services/Org_Structure_FY2011.pdf

Plaintiffs must establish that each TDCJ chief executive, as an administrator/policy maker, through deliberate conduct was "the moving force behind the injury" alleged and must establish a direct causal link between his action in formulating and implementing a specific policy that resulted in the deprivation of a federally protected right. *Board of County Comm'r v. Brown*, 520 U.S. 397, 405 (1997). Plaintiffs have made no allegations satisfying this threshold. They have done the opposite. They picked the top three (3) TDCJ executives, and aside from claiming that prison air conditioning is constitutionally required or that they should have "taken steps" or had better heat policies, based their suit against them on the basis of dozens of decisions made by the 18 co-defendants responsible for providing medical care, supervision and housing assignments at the Gurney Unit.

Accordingly, TDCJ Director Brad Livingston, TDCJ Correctional Institutions Division (CID) Director William Stephens and retired CID Director Rick Thaler ask that the Amended Complaint be dismissed against them on the basis of qualified immunity. Defendants also request attorney's fees and costs as provided by 42 U.S.C. 1988(b).[12]

> Respectfully submitted,
>
> GREG ABBOTT
> Attorney General of Texas
>
> DANIEL T. HODGE
> First Assistant Attorney General

---

[12]     (b) Attorney's fees. In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92-318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 13981 of this title, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.

DAVID C. MATTAX
Deputy Attorney General for Defense Litigation

KAREN D. MATLOCK
Assistant Attorney General
Chief, Law Enforcement Defense Division

/s/ Demetri Anastasiadis
DEMETRI ANASTASIADIS
Assistant Attorney General
Attorney-In-Charge
State Bar No. 01164480

Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711
(512) 463-2080 / (512) 495-9139 (fax)

**ATTORNEYS FOR DEFENDANT
BRAD LIVINGSTON**

**NOTICE OF ELECTRONIC FILING**

I, DEMETRI ANASTASIADIS, Assistant Attorney General of Texas, do hereby certify that I have electronically submitted for filing, a true and correct copy of the above and foregoing **Defendant Livingston, Stephens, and Thaler's Motion to Dismiss On the Basis of Qualified Immunity**, in accordance with the Electronic Case Files system of the Eastern District of Texas, on this the 27th day of September, 2013.

/s/ Demetri Anastasiadis
DEMETRI ANASTASIADIS
Assistant Attorney General

## CERTIFICATE OF SERVICE

I, DEMETRI ANASTASIADIS, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Defendant Livingston, Stephens, and Thaler's Motion to Dismiss On the Basis of Qualified Immunity,** has been served electronically *via* the Electronic Case Files system of the Eastern District of Texas, on this the 27th day of September, 2013, addressed to:

Jeff Edwards
EDWARDS LAW
The Haehnel Building
1101 East 11th Street
Austin, Texas  78702
jeff@edwards-law.com
*Attorney for Plaintiffs Stephen McCollum*
*Stephanie Kingrey, and Sandra McCollum*

James Harrington
Brian McGiverin
Scott Medlock
TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, Texas  78741
jch@mail.utexas.edu
brian@texascivilrightsproject.org
scott@texascivilrightsproject.org
*Attorneys for Plaintiffs Stephen McCollum*
*Stephanie Kingrey, and Sandra McCollum*

Eliot D Shavin
SMU LEGAL CLINIC
2600 State Street
Dallas, Texas  75204
eshavin@sbcglobal.net
*Attorney for Plaintiffs Stephen McCollum*
*Stephanie Kingrey, and Sandra McCollum*

Bruce R Garcia
Johnathan Stone
Assistant Attorney Generals
Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711
bruce.garcia@texasattorneygeneral.gov
johnathan.stone@texasattorneygeneral.gov
*Attorneys for Defendants Texas Department of*
*Criminal Justice, Richard Clark, Robert Eason,*
*Jeff Pringle, Sandrea Sanders, and Karen Tate*

Kim Coogan
Erika Hime
Lacey Mase
Assistant Attorney Generals
Office of the Attorney General of Texas
Law Enforcement Defense Division
P. O. Box 12548, Capitol Station
Austin, Texas  78711
kim.coogan@texasattorneygeneral.gov
erika.hime@texasattorneygeneral.gov
lacey.mase@texasattorneygeneral.gov
*Attorneys for Defendant*
*University of Texas Medical Branch*

/s/ Demetri Anastasiadis
DEMETRI ANASTASIADIS
Assistant Attorney General