UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ASHLEY ADAMS, individually and as the representative of the Estate of RODNEY GERALD ADAMS; and WANDA ADAMS, individually; | § § § § | |
| CARLETTE HUNTER JAMES, individually and as the representative of the Estate of KENNETH WAYNE JAMES; KRISTY JAMES, KRYSTAL JAMES, KENDRICK JAMES, ARLETT JAMES, JONATHAN JAMES and KENNETH EVANS, individually and as heirs-at-law to the Estate of Kenneth Wayne James, and MARY LOU JAMES, individually, | § § § § § § § § | |
| CADE HUDSON, individually and as the representative of the Estate of DOUGLAS HUDSON, PLAINTIFFS | § § § § § § § | CIVIL ACTION NO. 6:13-CV-712 JURY DEMANDED |
| v. BRAD LIVINGSTON, individually and in his official capacity, JOE OLIVER, NANCY BETTS, L. FIELDS, JOHN DOE, ROBERT LEONARD, BRANDON MATTHEWS, DEBRA GILMORE, SARAH RAINES, DANNY WASHINGTON, MATTHEW SEDA, TULLY FLOWERS, DORIS EDWARDS, LINDA McKNIGHT, REVOYDA DODD, RICK THALER, WILLIAM STEPHENS, ROBERT EASON, DENNIS MILLER, REGINALD GOINGS, and OWEN MURRAY in their individual capacities, TEXAS DEPARTMENT OF CRIMINAL JUSTICE, and UNIVERSITY OF TEXAS MEDICAL BRANCH DEFENDANTS | § § § § § § § § § § § § § § § § § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' LIVINGSTON, STEPHENS AND THALER'S MOTION TO DISMISS**

Douglas Hudson, Kenneth Wayne James, and Rodney Adams died from heat stroke because they endured brutally hot temperatures at the Texas Department of Justice Gurney Unit, and could not cool their bodies due to their medical conditions. Their survivors have sued TDCJ executive director Brad Livingston, institutional division director Rick Thaler, and deputy institutional division director William Stephens, because they knew non-violent prisoners with heat-sensitive medical conditions were routinely exposed to indoor heat indexes exceeding 100 degrees, but they did nothing to protect these vulnerable prisoners from the dangers they knew came from such extreme temperatures.

## SUMMARY

TDCJ policymakers, including Livingston, Thaler, and Stephens, deliberately chose to imprison people with heat-sensitive medical conditions, like Hudson, James and Adams, in prisons where indoor heat indexes routinely exceed 100 degrees. Though Livingston, Thaler and Stephens knew prisoners not only suffered, were injured, and many even died, from these conditions, they took, and continue to take, no reasonable action to lower the indoor temperatures or otherwise protect inmates from death.

Livingston, Thaler and Stephens are liable for these deaths because they personally knew the lethal heat endured by prisoners was a serious, system-wide danger in Texas prisons (where at least 14 people have died since 2007, and three deaths happened at the Gurney Unit), and because they were indifferent to that danger. Despite knowing prisoners like Hudson, James and Adams were at grave risk in these conditions, Livingston, Thaler, and Stephens failed to implement policies that modified or restricted inmates' housing assignments, and failed to provide vulnerable prisoners like them any

meaningful protection from the extreme heat. Moreover, Livingston, Thaler, and Stephens ended nighttime infirmary service at the Gurney Unit, without modifying officers' responses to emergencies, which necessarily delayed the prisoners' access to medical care when they suffered the fatal heat strokes.

As the highest-ranking executives at TDCJ, Livingston, Thaler, and Stephens are people in the agency who actually had the ability and authority to approve cooling inmate living areas, or moving the most vulnerable prisoners to prisons that were climate controlled, or at the very least ensuring these most vulnerable prisoners – men with serious medical complications like Hudson, James, and Adams – received some protection from these extreme temperatures. But they did nothing save acknowledge the incredible danger in which TDCJ placed these prisoners.

Livingston, Thaler, and Stephens cannot claim qualified immunity because their failure to protect these most vulnerable people, like Hudson, James, and Adams, was clearly unconstitutional at the time these men died.

## I.      STANDARD OF REVIEW

### A.      *Rule 12(b)(6) Motions are Disfavored and Rarely Granted*

The Court should deny Livingston, Thaler, and Stephens' Rule 12(b)(6) motion because it cannot be granted unless the pleadings are deficient on their face. *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012). "The central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010) (citation omitted).

Motions to dismiss for failure to state a claim "are viewed with disfavor and [are] rarely granted." *Parker v. Am. Airlines, Inc.*, 516 F. Supp. 2d 632, 634 (N.D. Tex. 2007)

(citing *Kaiser Aluminum & Chem. Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982)). When reviewing a motion to dismiss, Courts are required to accept "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Lindquist v. City of Pasadena*, 525 F.3d 383, 386 (5th Cir. 2008) (internal quotation marks and citations omitted).[1]

And when a governmental entity is also a defendant, such as this case, plaintiffs will often not have access to critical documents before conducting discovery. Thus, "only minimal factual allegations should be required at the motion to dismiss stage." *Thomas v. City of Galveston*, 800 F.Supp.2d 826, 842-43 (S.D. Tex. 2011).

Here, Plaintiffs' pleadings overwhelmingly show Livingston, Thaler, and Stephens violated Hudson, James, and Adams' constitutional rights to be free from substantial risk of serious harm, and right to access medical care, which were clearly established law at the time of their deaths. *See Bishop v. Arcuri*, 674 F.3d 456, 460-61 (5th Cir. 2012) (describing two-element standard for qualified immunity).

---

[1] Plaintiffs' allegations that, according to the National Weather Service, "heat is the number one weather-related killer in the United States" is thus presumed true, and the Court should not require a citation. The Court certainly, at the motion to dismiss stage, should not consider Livingston's citations to the *New American*, a journal of the John Birch Society decrying "global warming alarmists" concerns about climate change. *See* William F. Jasper, "Hot or Cold: Which is More Deadly?", *The New American*, Dec. 23, 2008, *available at* http://www.thenewamerican.com/tech/environment/item/6665-heat-or-cold-which-is-more-deadly. (Though, if the Court is interested, the National Weather Service's warnings about heat can be found here: National Weather Service, *Heat: A Major Killer*, http://www.nws.noaa.gov/os/heat/ index.shtml). Furthermore, as Defendants have introduced matters outside the pleadings, their motion should be converted into one for summary judgment, as discussed below.

**B.      *Livingston, Thaler and Stephens' Citations Outside the Record Require Converting the Motion to a Summary Judgment Motion***

In support of their motion to dismiss, Livingston, Stephens and Thaler include numerous citations on matters ranging from the credibility of National Weather Service data to the number of people imprisoned in TDCJ facilities.

When matters outside the pleadings are presented to and not excluded by the district court, the district court must convert a motion to dismiss into a motion for summary judgment. *See Brown v. Harris Co. Bail Bond Bd.*, 139 F.3d 513, 517 (5th Cir. 1998). As Defendants use these citations, albeit disingenuously, to argue that there is not a policy in the prison of exposing prisoners to dangerous temperatures, Plaintiffs respectfully request the Court exclude the citations or convert the Defendants' motion into one for summary judgment.

Should the Court choose the latter, Plaintiffs would request leave to conduct discovery to respond to the points raised in the Defendants' motion, which would include written discovery and depositions of Livingston, Thaler, and Stephens, the medical provider defendants, and Rule 30(b)(6) witnesses on issues concerning policies, practices and procedures related to extreme temperatures in TDCJ prisons.

## II.      FACTS – HIGH INDOOR TEMPERATURES ARE KILLING TEXAS PRISONERS AT AN ALARMING RATE

Conditions inside TDCJ's prisons around the state, and particularly at the Gurney Unit, are killing people. Though every county jail is required by law to keep indoor temperatures between 65 and 85 degrees, large portions of the inmate housing areas in

state prisons are not climate controlled.[2] During the summer, the indoor temperatures prisoners at the Gurney Unit experience are virtually identical to standing outdoors in the hot Texas sun.[3] National Oceanic and Atmospheric Administration documents incorporated into TDCJ policies recognize heat stroke is "imminent" at these temperatures.[4]

TDCJ policies and training materials Livingston, Thaler, and Stephens were familiar with identify men like Hudson, James, and Adams as particularly vulnerable to the heat. Hudson and James each suffered from hypertension – a cardiovascular disease often treated with diuretics that prevent patients' bodies from regulating internal temperatures.[5] Adams and Hudson suffered from depression – a chronic mental illness treated with medications known to increase patients' risk of heat-related illness.[6] But Livingston, Thaler, and Stephens knew men with these serious medical conditions were routinely housed in TDCJ's extremely hot prisons.[7]

Moreover, Livingston, Thaler, and Stephens knew prisoners at the Gurney Unit were particularly vulnerable. The Gurney Unit is a "transfer facility" – a prison where inmates are processed into the TDCJ system from the air-conditioned county jails. Because newly arrived prisoners' bodies are not acclimated to the extreme heat, they are

---

[2] Plaintiffs' Amended Complaint, Doc. 8, ¶ 76.

[3] *Id*., ¶ 40.

[4] *Id*., ¶ 44.

[5] *Id*., ¶¶ 141-145, 152 (Hudson), 172 (James).

[6] *Id*., ¶¶ 146-148, 152 (Hudson), 199-201 (Adams).

[7] *Id*., ¶ 148.

at even greater risk of heat stroke.[8] In fact, Hudson, James, and Adams had barely arrived at the prison when the extreme temperatures struck them down. Hudson died four days into his short sentence. James only made it three days. And Adams died after less than 24 hours.

Sadly, Hudson, James, and Adams were not the only men killed by heat stroke. In fact, beginning in 2007, at least fourteen men died in TDCJ prisons around the state from heat stroke, a medical emergency that should never occur inside a government-run facility.[9] At the time these men died, their body temperatures rose as high as 109.9 degrees.

---

[8] *Id.*, ¶¶ 74-80.

[9] These deaths only include fatalities where the medical examiner determined the cause of death was "hyperthermia" – though hyperthermia is an under-reported cause of death, and heat may be a contributing factor in many other deaths. (*Id.*, ¶ 47).   Thus, it is likely the numbers of deaths caused by the extreme heat inside prison living areas is far higher.

| Name | Age | Unit | Date of Death | Body Temp. | Facts |
|---|---|---|---|---|---|
| James Shriver | 47 | Byrd | Aug. 8, 2007 | Unk. | History of hypertension, prescribed psychotropics |
| Dionicio Robles | 54 | Byrd | Aug. 13, 2007 | Unk. | Prescribed psychotropics, incarcerated less than one month |
| Douglas Hudson | 62 | Gurney | July 25, 2011 | 105 | History of hypertension, prescribed medication "known to interfere with heat dissipation," died 5 days after arrival |
| Larry McCollum | 58 | Hutchins | July 28, 2011 | 109.4 | Diabetic, prescribed diuretic, found 2:00 am, died 1 week after arrival |
| Thomas Meyers | 46 | Coffield | Aug. 3, 2011 | 105.6 | History of hypertension, prescribed psychotropics |
| Robert Webb | 50 | Hodge | Aug. 4, 2011 | Unk. | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:30am |
| Alexander Togonidze | 44 | Michael | Aug. 8, 2011 | 106+ | Diabetic, prescribed psychotropics, previously complained of heat-related illnesses, collapsed 8:00am |
| Charles Cook | 53 | Hodge | Aug. 8, 2011 | 107.9 | Developmentally disabled, prescribed psychotropics, found unresponsive at 3:00am |
| Michael Martone | 57 | Huntsville | Aug. 8, 2011 | 106.5 | Prescribed psychotropics |
| Kelly Marcus | 36 | Connally | Aug. 12, 2011 | Unk. | Prescribed diuretic, found at 3:30 am |
| Kenneth Wayne James | 52 | Gurney | Aug. 13, 2011 | 108 | Prescribed diuretic, died 3 days after arrival |
| Daniel Alvarado | 44 | Huntsville | Aug. 20, 2011 | 105.2 | HIV+, prescribed psychotropics, found unresponsive at 9:20 am |
| Rodney Adams | 45 | Gurney | Aug. 3, 2012 | 109.9 | Prescribed psychotropics, died 1 day after arrival |
| Albert Hinojosa | 44 | Garza West | Aug. 27, 2012 | Unk. | Died at transfer facility, obese, found shortly after midnight |

Half these men died at transfer facilities – the Gurney, Hutchins, and Byrd Units – where prisoners are processed into the TDCJ system. They all had underlying medical conditions Livingston, Thaler, and Stephens knew put them at increased risk of injury or death.

As these men began to die, Livingston, Thaler, and Stephens – though actually aware of the imminent danger to vulnerable prisoners with similar medical conditions – made no changes to TDCJ's operations.[10] Robles and Shriver's tragic deaths in 2007 should have been a wake-up call – instead, it was more business as usual. Their deaths gave Livingston, Thaler, and Stephens actual notice that the extreme heat was dangerous and that they needed to take steps to either cool the prisons or immediately get people with heat-sensitive medical conditions to safe confines.

Hudson was the second man to suffer a fatal heat stroke in TDCJ custody in 2011.[11] When he arrived at the prison from a climate controlled jail, officials knew he was taking medications to treat his disabilities – hypertension and depression – that put him at increased risk for heat stroke when exposed to extreme temperatures.[12] In fact, the temperature reached 101 degrees the day he arrived at the prison.[13] Just days after

---

[10] *Id.*, ¶¶ 99-115.

[11] Though Hudson died before Larry McCollum, McCollum collapsed from the high temperatures a few days before Hudson's death, but remained hospitalized in the intensive care unit for a week until he finally passed away. Hudson died while McCollum was in the ICU.

[12] *See* Plaintiffs' Amended Complaint, ¶¶ 152-153.

[13] *Id.*, ¶ 151.

arriving at the Gurney Unit, Hudson collapsed as the extreme indoor temperatures ravaged his body. Shortly thereafter, as his body temperature soared over 105, he died.[14]

Just a few weeks later, James died at the same prison in almost the same way. Shortly after he arrived from a climate controlled jail, he was prescribed a diuretic to treat hypertension, which Defendants knew put him at increased risk.[15] Even after Hudson's death less than a month before, prison officials made no changes. Shockingly, James died in almost the same way Hudson did. James, age 52, was serving a short sentence for violating a probation.[16] After officers watched his condition deteriorate in the extreme temperatures over several hours, James collapsed and died from heat stroke.[17] His body temperature reached 108.[18]

Then, the next year, Rodney Adams died from heat stroke – again at the same prison, again because high-ranking prison officials took no new steps to protect the prisoners especially vulnerable to high heat-indexes. Adams, like Hudson, was taking a psychiatric medication to treat his mental illness.[19] Adams was 45 years old and had been sentenced to serve four years for driving while intoxicated. Instead, he died less than a day after arriving at the Gurney Unit when his body temperature reached 109.9.[20]

---

[14] *Id.*, ¶¶ 159-171.

[15] *Id.*, ¶ 174.
[16] *Id.*, ¶ 172.

[17] *Id.*, ¶¶ 175-190.

[18] *Id.*, ¶ 192.

[19] *Id.*, ¶ 199.

[20] *Id.*, ¶¶ 196-212.

In addition to housing men in these high temperatures they *knew* were dangerous, Livingston, Thaler, and Stephens also decided to end night-time medical care at the Gurney Unit. Not keeping the climate-controlled infirmary open after 6:00 pm contributed to Hudson and James' deaths. Hudson was first observed suffering from the effects of the heat early in the morning the day he died. Officers sent him to the infirmary. But when medical staff left at 6:00 pm, Hudson was kicked out of the air-conditioned infirmary back into the extremely hot dormitory, where he quickly collapsed from the intense temperatures. Because the medical staff had left at 6:00 pm, as Livingston, Stephens and Thaler intended, and because no new policies concerning emergency care were adopted, it took over an hour for 911 to be called by nurses at another prison.[21] Likewise, when James began to suffer the early signs of heat exhaustion around 6:00 pm, nurses refused to treat him so they could go home on time – even though Hudson died merely weeks before under near identical circumstances. Because there were no medical staff at the prison, James' treatment was delayed several hours – resulting in his death.[22] Thus, Livingston, Thaler, and Stephens' refusal to protect prisoners from extreme temperatures with after-hours care is also evidence of their deliberate indifference to prisoners' safety, in the face of numerous heat stroke deaths and heat-related illnesses suffered annually by prisoners and correctional officers.

## III.    ARGUMENT

### A.    LIVINGSTON, THALER, AND STEPHENS' KNOWING FAILURE TO PROTECT VULNERABLE PRISONERS FROM EXTREME HEAT VIOLATES THE EIGHTH AMENDMENT

---

[21] *Id.*, ¶ 154-171.

[22] *Id.*, ¶ 177-192.

Livingston, Thaler, and Stephens are liable under the Eighth Amendment for Hudson, James and Adams' deaths because:

1) Prison conditions that objectively threatened a substantial risk of serious harm to vulnerable prisoners killed Hudson, James, and Adams; and,

2) Livingston, Thaler and Stephens personally knew about this life-threatening danger to vulnerable prisoners but recklessly disregarded it.

*Blackmon v. Garza*, 484 Fed.Appx. 866, 869 (5th Cir. 2012) (unpublished) (the test for Eighth Amendment liability has an objective element and a subjective element).

### 1. *Livingston, Thaler, and Stephens Knew Extreme Temperatures Were Deadly for Vulnerable Prisoners But Chose Not to Protect Them*

Livingston, Thaler, and Stephens were actually aware of brutal heat in Texas prisons, notwithstanding it was also an obvious hazard. Thus, even if Livingston, Thaler and Stephens did not know men were dying (though they did),[23] a jury may infer they were aware of the obvious fact that temperatures inside the prison were dangerous. *Blackmon*, 484 Fed.Appx. at 873 (*citing Gates*, 376 F.3d. at 340). As the Fifth Circuit explained:

> [The Warden] testified that she was aware that the summer heat was "intense." Moreover, the evidence set out at trial indicated that Defendants had received training making them aware of the potential dangers of heat to prisoners. The training highlighted the particular risks to prisoners such as [the plaintiff]—an older inmate taking medications with a diuretic effect. Thus, the obvious nature of the risks to [the plaintiff] would further support a jury finding that Defendants were deliberately indifferent to the risks to [the plaintiff's] health.

*Blackmon*, 484 Fed.Appx. at 873. Here, Plaintiffs allege Livingston, Thaler, and Stephens knew indoor air temperatures in TDCJ facilities regularly exceeded 90 degrees, knew these conditions previously killed men, and knew these extreme conditions endangered

---

[23] *Id.*, ¶ 102.

prisoners with medical conditions like the ones Hudson, James and Adams suffered from.[24]

And these extreme temperatures were not confined to a single prison facility – Plaintiffs allege the hazard exists in prisons Livingston, Thaler, and Stephen were personally responsible for supervising around the state. A jury could ultimately infer Livingston, Thaler, and Stephens were aware of the injuries and deaths racked up year after year due to their decision to expose prisoners to this obvious danger.[25]

James and Adams were the eleventh and thirteenth men, respectively, to die from heat stroke since 2007. Hudson was the fourth man.  Yet at no point did Livingston, Thaler, or Stephens do anything to protect these vulnerable prisoners or their brethren. Rather, they continued to let people like the Plaintiffs' decedents die.

Accordingly, Livingston, Thaler, and Stephens' failure to remedy these glaring, obvious deficiencies to protect prisoners' lives evidences their deliberate indifference to the dangerous prison conditions.   In fact, courts in the Fifth Circuit regularly admit evidence of post-injury conduct by prison officials to determine whether they acted with deliberate indifference. *See*, *e.g.*, *Payne v. Collins*, 986 F.Supp. 1036, 1058 (E.D. Tex. 1997) (overruling objection to relevance of prison investigation "because it was instigated by events subsequent to the attacks on [plaintiff]") (citing *International Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991)). In *Payne*, the trial

---

[24] *Id.*, ¶¶ 122, 136.

[25] Imagine if there was a security design flaw that affected all similarly designed prisons – if the cell doors would not lock, for example. Would the TDCJ executive director seriously argue that he would only be responsible for fixing the locks at the prison where an escape actually occurred, or at all the prisons known to have the same or similar design flaw? Here, all the prisons where deaths occurred were similarly flawed, in that they each exposed vulnerable prisoner to dangerously high temperatures when their bodies could not cool down.

court admitted an administrative review conducted by TDCJ that "assessed all aspects of the [prison] after a number of inmates attacked some [officers] and a prisoner was found dead." *Payne*, 986 F.Supp. at 1050. The report was completed months after a prisoner was beaten to death at the prison by other inmates, and discussed other assaults occurring after the death. *See id.*, n. 32. The Fifth Circuit approved admitting this type of evidence to establish liability of correctional facilities at trial. *Shepherd v. Dallas Co.*, 591 F.3d 445, 457 (5th Cir. 2009) (admitting report into evidence showing jail's "specific incidents of failure to provide adequate medical care that occurred shortly before, during, and shortly after the period of [the prisoner's] detention" to show medical care "constitutionally inadequate"). Livingston, Thaler, and Stephen's failure to act to prevent Hudson's, and then James' and then Adams' deaths, not to mention the eleven others, confirms their indifference toward all prisoners at risk of heat stroke. When combined with their *actual* knowledge of the danger to prisoners with heat-sensitive medical conditions, and the *actual* knowledge of the consequences of not protecting prisoners from the danger – based on their own internal documents and testimony – the indifference is glaringly apparent.

At the same time, Livingston, Thaler, and Stephens knew the vast majority of TDCJ prisons, including the Gurney Unit, were not climate controlled.[26] Even though state law requires county jails to keep indoor temperatures between 65 and 85 degrees, indoor temperatures in the state prisons routinely soar over 100 degrees every summer.[27]

---

[26] *Id.*, ¶ 40.

[27] *Id.*, ¶ 76 (citing Tex. Admin. Code § 259.160).

The indoor temperatures do not cool off – even late into the night they remain over 90.[28]

Livingston, Thaler, and Stephens also knew extreme heat could cause serious injury or

death, and posed an even higher risk of harm to prisoners known to be vulnerable to the

heat such as those over age 40, with hypertension, mental illnesses, or taking drugs that

dehydrate the body – all factors associated with Hudson, James and Adams.[29]

Livingston, as the executive director, was uniquely positioned to approve

measures, like air conditioning or other cooling mechanisms that would bring down the

outrageous indoor temperatures at the Gurney Unit – just as he and TDCJ chose do for

pigs raised for slaughter in TDCJ's agricultural programs.[30] Likewise, Livingston, Thaler,

and Stephens were intimately involved in the decision to end nighttime medical care at

the Gurney Unit, which caused the fatal hour-long delay in obtaining treatment for James

and Hudson.[31] Livingston made these decisions to save the agency money, though he

knew these policies would put prisoners' lives at risk.[32]

---

[28] *Id.*, ¶ 40.

[29] *Id.*, ¶ 76.

[30] *See* Mike Ward, "Steamy prisons, cool pig barns: Climate-controlled barns show swine are better off than guards, convicts, critics say," *Austin American-Statesman*, Aug. 17, 2013 (attached as Exhibit 1). In June 2013, TDCJ signed a contract to purchase six climate controlled "swine barns." Livingston's deputy, Bryan Collier, told the press the climate-controlled barns were necessary because "pigs can't sweat." Elizabeth Koh, "Climate-controlled Swine Buildings Dismay Inmates' Advocates," *Texas Tribune*, Aug. 16, 2013 (attached as Exhibit 2). Likewise, Plaintiffs' complaint alleges certain drugs, like those Hudson and James were taking, diminish human beings ability to sweat and cool the body. Amd. Complaint, ¶ 144. Plaintiffs request the Court take judicial notice of "certain things said in the press." *Staehr v. Hartford Fin. Services Group, Inc.*, 547 F.3d 406, 425 (2nd Cir. 2008).

[31] *Id.*, ¶ 93.

[32] *Id.*

Indeed, Livingston, Thaler, and Stephens' decisions created an obvious threat to Hudson, James, and Adams. Extreme heat in the Gurney Unit was (and is) long-standing, well-documented, and expressly noted by prison officials.[33] As far back as 1999, federal judges had expressly noted prisoners in TDCJ custody were dying from exposure to extreme summer temperatures.[34] Two prisoners had died from heat stroke just a few summers before.[35] But despite all these previous deaths, no life-saving changes were made before Hudson, James, and Adams arrived at the Gurney Unit.

And these extreme temperatures were not confined to a single prison facility – Plaintiffs allege they exist in prisons around the state. Livingston, Thaler, and Stephens are not just responsible for conditions at the Gurney Unit, but for conditions statewide. The jury may infer they were aware of the number of injuries and fatalities racked up year after year due to TDCJ's decision to expose prisoners to this obvious hazard.

Previous lawsuits have also brought these particularly dangerous conditions to Livingston, Thaler, and Stephens' personal attention. In *Blackmon v. Kukua*, 758 F.Supp.2d 398 (S.D. Tex. 2010), Livingston was sued in his individual capacity over nearly identical prison conditions in a different TDCJ prison. Though the trial court granted summary judgment on the claims against Livingston because he allegedly lacked personal knowledge of the conditions, the prisoner's allegations in *Blackmon* concretely provided him notice that prisoners were deprived "minimal civilized measures of life's

---

[33] *Id.*, ¶ 134.

[34] *Id.*, ¶ 80. *See Ruiz v. Johnson*, 37 F.Supp.2d 855, 904 (S.D. Tex. 1999).

[35] *Id.*, ¶ 80.

necessities" in prisons extremely similar to the Gurney Unit. *See id.*, at 408.[36] The court denied the remaining defendants requests for qualified immunity, and sent the case to trial.[37]

### 2. Knowledge of Dangerous Conditions and Failure to Protect Prisoners Creates Liability

Likewise, it is not necessary to show Livingston, Thaler, or Stephens predicted Hudson, James, or Adams, in particular, would fall prey to the heat. Plaintiffs need only allege defendants were aware the heat was a widespread danger to heat-vulnerable prisoners like Hudson, James, and Adams – which Plaintiffs did.[38] *Farmer v. Brennan*, 511 U.S. 825, 843-44 (1994). Defendants' protestations they had no personal involvement in the "medical treatment, supervision, classification, [or] assignment" of the deceased are irrelevant because Livingston, Thaler, and Stephens each knew about and tolerated the dangerous conditions that ultimately killed Hudson, James, and Adams, as well as many other men.[39] The Supreme Court has long acknowledged:

---

[36] Notably, *Blackmon* addressed the quality of the summary judgment *proof* against Livingston, not the adequacy of the *pleadings*. *Blackmon v. Kukua*, 758 F.Supp.2d at 411. Regardless, the pleadings here are far more robust than the complaint in *Blackmon*. Blackmon's complaint against Livingston, for example, did not allege a system-wide problem resulting in multiple deaths resulting from high-level policy decisions. And the trial court relied exclusively on the fact Livingston did not review Blackmon's grievances about the heat. Of course, Blackmon had the good fortune to survive the extreme temperatures. As discussed below, Livingston did not need personal knowledge an injury would befall any particular prisoner – he merely needed to know conditions in his prison were dangerous.

[37] At trial, the district court erroneously dismissed the case at the close of the plaintiff's evidence on a motion for a judgment as a matter of law. This decision was reversed by the Fifth Circuit in *Blackmon v. Garza*, 484 Fed.Appx. 866 (5th Cir. 2012), which held in no uncertain terms that prison officials must protect prisoners – especially those with heat-sensitive medical conditions – from extreme heat.

[38] Plaintiffs' Amd. Complaint, ¶ 45.

[39] Doc. 85, Livingston's Motion to Dismiss on the Basis of Qualified Immunity, Doc. 19, ¶ 1.

> If, for example, prison officials were aware that inmate rape was so common and uncontrolled that some potential victims dared not sleep but instead ... would leave their beds and spend the night clinging to the bars nearest the guards' station, it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

*Farmer*, 511 U.S. at 843-44. *See also Blackmon v. Garza*, 484 Fed.Appx. at 873 ("a jury could reasonably conclude that the heat-related health risks to [a prisoner] were obvious"). Hudson, James, and Adams fit the profile of a vulnerable prisoner according to TDCJ policies Livingston, Thaler, and Stephens implemented. Though they may not have known that Kenneth Wayne James, individually, would die from extreme temperatures, they knew heat stroke was "imminent" for a man like him, and are not required to "guess" which of the prisoners they exposed to these dangers would eventually be struck down.

Livingston, Thaler, and Stephens knew that TDCJ imprisoned many people over the age of 40, with medical conditions like hypertension or depression (including Hudson, James, and Adams), who were especially vulnerable to heat.[40] *See Blackmon*, 484 Fed.Appx. at 871 ("[The inmate] was on medication for high blood pressure, which functioned as a diuretic and had the potential to make the high temperatures in the [prison] dorm even more dangerous to [him] than to other prisoners. This court has acknowledged that medications can impact a prisoner's ability to contend with extreme heat"). But even though TDCJ has prison units that offer some climate-controlled inmate housing, where especially vulnerable inmates fitting this known profile could be transferred, Livingston, Thaler, and Stephens refused to make any effort to protect them or issue any policy direction in that regard.

---

[40] Plaintiffs' Amd. Complaint, ¶ 45.

And while the other individual defendants contributed to Hudson, James, and Adams' deaths, low-level correctional officers and nurses, unlike Livingston, Stephens, and Thaler, could not change the system-wide policies that ensured men were imprisoned in extremely hot temperatures, denied prisoners cups, shorts, and fans, and otherwise failed to protect them from the extreme temperatures. Likewise, officers and nurses at the Gurney Unit did not make the decision to end night-time infirmary service at the prison, to require prisoners be evaluated at the Beto Unit before receiving emergency medical treatment, or to provide climate-controlled barns for pigs. Those decisions were made from Livingston, Thaler, and Stephens' (air conditioned) offices in Huntsville.

Likewise, Livingston, Thaler, and Stephens surely knew ending nighttime medical care at the Gurney Unit would jeopardize prisoners suffering medical emergencies. Even under ideal circumstances, officers would have to call an ambulance to transport a prisoner to an outside hospital. But here, there were no medical staff at the prison when Hudson and James suffered the heat stroke, and officers delayed contacting 911 for hours – something no competent medical provider would ever have permitted and that resulted in the denial of life-saving emergency medical care for Hudson and James.[41] The infirmary is one of the few places at the Gurney Unit where prisoners can get out of the heat – indeed, Hudson spent several hours in the infirmary the day he died.[42] But when the infirmary shut down at 6:00 pm, Hudson was thrown back into the blazing hot dormitories, where he collapsed soon thereafter.[43] When the deceased began suffering

---

[41] *Id*. ¶¶ 54, 57-64.

[42] *Id*., ¶¶ 154-56.

[43] *Id*., ¶¶ 157-60.

heat strokes, time was wasted contacting licensed vocational nurses at the Beto Unit (who, by law, cannot make diagnoses),[44] then futilely transporting the men to this obviously incapable medical staff instead of immediately calling 911.[45]

While it is true free citizens also have to wait for an ambulance after calling 911, they can simply pick up a phone to call 911 or take themselves to an emergency room – they do not have to wait for an officer to contact a nurse, then wait to be transported to another prison to be examined by medical staff legally-incompetent to make diagnoses or prescribe treatment, then wait for those legally-incompetent providers to pick up the phone before finally dispatching an ambulance.[46] Delaying, or in this case, effectively denying, access to needed medical care violates the Eighth Amendment. *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (denying qualified immunity to nurse who delayed treatment of prisoner); *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003) (delaying treatment to prisoner suffering heat stroke). The correct analogy would be when the prisoners needed to call 911, and Livingston, Thaler, and Stephens' decisions effectively put them on hold for an hour. Here, time mattered, and Livingston, Thaler, and Stephens' penny-wise decision to eliminate medical staff cost Hudson and James their lives.

### 3. Plaintiffs Allege Livingston, Thaler, and Stephens' Choices Personally Caused Hudson, James, and Adams' Deaths

---

[44] *See* TEX. OCCUPATIONS CODE Chp. 301.002(5) (defining scope of practice of licensed vocational nurses).

[45] Plaintiffs' Amd. Complaint, ¶¶ 160-170 (Hudson's care delayed over an hour); ¶¶ 177-191 (James' care delayed over ten hours).

[46] The complaint alleges there were no doctors, only licensed vocational nurses, on duty at the Beto Unit, where prisoners had to go before 911 was called. Licensed vocational nurses cannot, by law, make "medical diagnos[es] or prescri[be] … therapeutic or corrective measures." *See supra*, n. 34.

Plaintiffs' Amended Complaint alleges Livingston, Thaler, and Stephens personally approved specific policies that threatened serious harm to vulnerable prisoners, like Hudson, James, and Adams:

a).    They approved policies that made no accommodation for vulnerable prisoners during periods of extreme temperatures (including policies and practices prohibiting Hudson, James, and Adams from having a fan, or even a drinking cup for cool water);[47]

b).    They failed to provide climate controlled housing, or cool the Gurney Unit's housing areas in any way, approving policies and practices that denied vulnerable prisoners safe housing;[48]

c).    They approved TDCJ policies that make no accommodations for housing people with medical conditions (like hypertension and depression) known to cause medical emergencies and death during periods of extreme temperature;[49]

d).    They approved ending round-the-clock medical care at the Gurney Unit, causing the fatal hour-long delay;[50] and,

e).    They took no steps to house prisoners with medical conditions complicated by high temperatures in climate-controlled areas.[51]

These were not decisions made locally at the prison, but globally for the system from Livingston, Thaler, and Stephens' air-conditioned offices in Huntsville. This is not an attempt to sue Livingston, Thaler, and Stephens merely because they are at the top of the TDCJ food chain. On the contrary, these executives personally approved the policies and practices that caused Hudson, James, and Adams' deaths.

---

[47] *Id.*, ¶¶ 81-84.

[48] *Id.*, ¶¶ 137.

[49] *Id.*, ¶ 66.

[50] *Id.*, ¶ 93.

[51] *Id.*, ¶ 51.

It is well settled that when high-ranking officials are involved in unconstitutional decisions they are personally liable. In *Anderson v. Pasedena Independent School District*, the Fifth Circuit reversed a trial court's decision dismissing executive defendants who unconstitutionally fired a school administrator. 184 F.3d 439, 443-44 (5th Cir. 1999). The Fifth Circuit found a plaintiff can state a claim under 42 U.S.C. § 1983 by "identify[ing] defendants who were *either* personally involved in the constitutional violation *or whose acts are causally connected to the constitutional violation alleged*." *Id*. (emphasis added). That is precisely what Plaintiffs' Amended Complaint alleges - Livingston, Thaler, and Stephens, high-ranking TDCJ policymakers, deliberately ignored the needs of sick prisoners they knew were especially vulnerable to extreme heat, when they knew heat stroke was "imminent."[52] Their deliberate indifference therefore, directly and proximately caused Hudson, James, and Adams' deaths.

Plaintiffs state a claim against policymakers when they allege "specifically enumerated decisions that … [violate] constitutional rights" – such as Livingston, Thaler, and Stephens'' decision not to provide safe housing or access to medical care for prisoners with heat-sensitive medical conditions, deny prisoners at transfer facilities even minimal accommodations (like shorts, fans, and cups), and decision to end night-time medical care at the Gurney Unit. *Id*. "Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (internal citations omitted). *See also Porter v. Epps*, 659 F.3d 440, 446 (5th Cir.

---

[52] *Id*., ¶ 44.

2011) (supervisor can be liable for "implement[ing] unconstitutional policies that causally result in the constitutional injury").

Here, Livingston, Thaler, and Stephens authored, approved and implemented a policy that failed to provide any protection to prisoners, particularly heat-vulnerable prisoners such as Hudson, James, and Adams, housed in extreme temperatures. Livingston, Thaler, and Stephens approved and implemented a policy and practice that failed to cool, in any fashion, most inmate living areas, exposing vulnerable prisoners to indoor temperatures that regularly exceeded 100, and heat indexes much higher.[53] The TDCJ policy on "Extreme Temperatures," which Livingston personally approved, and Thaler and Stephens endorsed and implemented, does not address *housing* prisoners safely – it only contemplates limiting outdoor convict labor during extreme temperatures.[54] When the indoor heat index eclipses 100, this is equivalent to removing windowpanes in an Upstate New York prison during the dead of winter. *Corselli v. Coughlin*, 842 F.2d 23, 27 (2nd Cir. 1987) (denying summary judgment for commissioner of New York prison system when prisoner exposed to "subfreezing" temperatures).

"Supervisory liability exists even without overt personal participation in the offensive act if supervisory officials implement a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation." *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) (internal citations omitted). Plaintiffs' complaint alleges Livingston, Thaler, and Stephens' policy itself violated Hudson, James, and Adams' constitutional rights, resulting in their deaths.

---

[53] *Id.*, ¶ 40.

[54] *Id.*, ¶ 62.

Contrary to their argument, cases Livingston, Thaler, and Stephens purportedly rely on confirm policymakers *can* be responsible for well-known, dangerous prison conditions. The Fifth Circuit in *Duvall v. Dallas Co.*, for example, reasoned "even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices." 631 F.3d 203, 207 (5th Cir. 2011).[55] The facts in *Duvall* are similar. There, the county jail consistently tolerated known staph infection rates well above those in similar facilities. Though simple, clear-cut, measures could have combatted the staph, the county's policymakers chose to do nothing. *Id.*, at 208-09. As a result, the plaintiff lost an eye due to developing a drug-resistant staph infection. Like Livingston, Thaler, and Stephens here, the county sheriff knew a jail condition was dangerous but failed to correct it. The Fifth Circuit affirmed a jury verdict for the prisoner.

Importantly, Plaintiffs *do not* argue Livingston, Thaler, or Stephens are liable under *respondeat superior* for their failure to provide medical care the night the deceased suffered their heat strokes. Instead, Livingston, Thaler, and Stephens are liable for creating and approving the dangerous conditions that *caused* the heat stroke, and failing to remedy them. Even had the officers and nurses not been indifferent and secured life-saving care for the prisoners, Hudson, James, and Adams still would have suffered a painful heat stroke due to Livingston, Thaler, and Stephens' high-level decisions.

---

[55] Notably, *Duvall* affirmed a verdict for the plaintiff. It does not address the adequacy of pleadings. In any event, Plaintiffs adequately plead the allegations *Duvall* requires – that policymakers decisions were the moving force behind the constitutional injury.

**B.   LIVINGSTON, THALER, AND STEHPENS ARE NOT ENTITLED TO QUALIFIED IMMUNITY BECAUSE THE LAW IS CLEARLY ESTABLISHED: EXTREME TEMPERATURES VIOLATE THE EIGHTH AMENDMENT.**

To defeat qualified immunity, Plaintiffs must show 1) the official violated a clearly established constitutional right, and 2) the official's conduct was not objectively reasonable. *Bishop v. Arcuri*, 674 F.3d 456, 460 (5th Cir. 2012). As discussed above, Hudson, James and Adams had a clearly established constitutional right to be protected from extreme temperatures and receive emergency medical care without delay.

Once a right is clearly established, a decision violating that right is objectively unreasonable. "If a right is clearly established enough to impart fair warning to officers, then their conduct in violating that right cannot be objectively reasonable." *Id*. (internal citations omitted).

The Eighth Amendment prohibits the prison system from housing inmates in conditions that threaten the substantial risk of serious harm – for instance, temperatures threatening heat stroke. *Blackmon v. Garza*, 484 Fed.Appx. at 869. Federal courts in Texas and the Fifth Circuit have repeatedly found high temperatures unconstitutional (*id*. 869-70), in opinions published long before Hudson, James, and Adams entered the Gurney Unit. *See Blackmon v. Kukua*, 758 F.Supp.2d at 413-14 (collecting cases showing the right was clearly established). Texas courts have even held people criminally liable for leaving dogs in "hot, very hot" cars. *Lopez v. State*, 720 S.W.2d 201, 202 (Tex. App. – San Antonio 1986). At the time Hudson, James, and Adams died, the law was clearly established that prison officials violate the Eighth Amendment by exposing inmates (especially those most vulnerable) to temperatures consistently over 90 degrees. *See, e.g.*, *Gates v. Cook*, 376 F.3d 323, 334 (5th Cir. 2004).

The law does not require a right to be precisely defined for a civil rights plaintiff to defeat qualified immunity. Rather, the "contours of [the] right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Bishop*, 674 F.3d at 466. The law must merely "impart fair warning to officers" that their conduct is illegal. *Id*. Plaintiffs do not need to show "the very action in question has previously been held unlawful." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004). "The law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id*.

Here, the law was clearly established that exposing prisoners with heat sensitive medical conditions to temperatures over 90 degrees violated the Eighth Amendment. *See*, *e.g.*, *Blackmon*, 484 Fed.Appx. 866; *Gates*, 376 F.3d 323. When conditions make it "likely an inmate would die of heat stroke or some other heat-related illness," prison officials violate inmates' Eighth Amendment rights. *Blackmon*, 484 F.Appx. at 870. Though the Fifth Circuit has not yet ruled what accommodations are required for the prisoners most vulnerable to heat stroke, "a reasonable jury could nonetheless conclude that such measures [TDCJ takes to abate the heat] were inadequate to satisfy the Eighth Amendment's demands." *Id*. Of course, saving Hudson, James, and Adams' lives did not require every cell have air conditioned – though it is inhumane to subject human beings to temperatures over 100 degrees without any respite. Plaintiffs claim is more limited. When prisoners suffer from medical conditions that make heat stroke – a medical emergency[56] – "imminent," prison officials must take measures necessary to save their

---

[56] *Id*., ¶ 69.

lives. The simplest measure TDCJ could have taken to save these men's lives would be to house them in one of the many available TDCJ housing units that were already air-conditioned.[57]  Even allowing heat-vulnerable prisoners a few hours in an air-conditioned space – like the prison's visitation area – would have made a difference.[58]

Many aspects of corrections are expensive. Treating prisoners with HIV, for example, requires costly antiretroviral drugs. *See Leavitt v. Correctional Medical Services, Inc.*, 645 F.3d 484, 498-99 (1st Cir. 2011). But cost is not a defense to the Eighth Amendment when prisoners' health and lives are at stake. *Rufo v. Inmates of Suffolk Co. Jail*, 502 U.S. 367, 396 (1992) ("the lack of resources can never excuse a failure to obey constitutional requirements").

And, of course, air conditioning every inmate housing was not necessary to save Hudson, James, and Adams. Most obviously, as people with known heat-sensitive medical conditions, they could not have been housed in one of the many TDCJ facilities where there was air conditioning, or utilized areas in the prison units, which were already climate controlled.[59] Even placing heat-vulnerable prisoners for a few hours in an air-conditioned space – like the prison's visitation area – would have made a difference.[60]

Thus, Hudson, James, and Adams were denied the protections the Fifth Circuit mandated in *Gates*. The Amended Complaint alleges:

1)      TDCJ does not provide adequate drinking water – both because sufficient ice water was not supplied and because newly arrived prisoners (like

---

[57] *Id.*, ¶ 60.

[58] *Id.*, ¶ 65.

[59] *Id.*, ¶ 60.

[60] *Id.*, ¶ 65.

Hudson, James, and Adams) were not given cups to drink the cool water with;[61]

2)    Prisoners cannot have personal fans at the Gurney Unit;[62]

3)    The Gurney Unit's windows are sealed shut, and cannot be opened for ventilation;[63]

4)    Newly arrived prisoners must wear the standard prison uniform – not the light-weight clothing or shorts inmates can later buy from the prison commissary,[64] and,

5)    The heat index indoors routinely exceeds 100 degrees, putting prisoners with heat-sensitive medical conditions at increased risk of death.

Thus, Livingston, Thaler, and Stephens were aware the Gurney Unit failed to take the steps the Fifth Circuit required in *Gates*. 376 F.3d at 336.

Livingston, Thaler, and Stephens should be denied qualified immunity because the pleadings demonstrate they were violating clearly established law. Plaintiffs' complaint *does not* allege they were negligent. Rather, Livingston, Thaler, and Stephens actually knew heat inside the prisons' dorm areas was extraordinarily dangerous; they knew housing prisoners the way they did in dangerous heat was unconstitutional; but they did it anyway. That is the definition of deliberate indifference and violated Hudson, James, and Adams' right to be protected from cruel and unusual punishment.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion.  In the alternative, should the Court feel that the pleadings are deficient in any way, Plaintiffs

---

[61] *Id.*, ¶ 83.

[62] *Id.*, ¶ 82.

[63] *Id.*, ¶ 58.

[64] *Id.*, ¶ 81.

would respectfully ask for leave to amend, and would request the opportunity to depose Livingston, Thaler, and Stephens to develop facts concerning his personal knowledge of the dangers posed by extreme heat.

DATED: October 25, 2013.

Respectfully submitted,

The Edwards Law Firm
The Haehnel Building
1101 East 11th Street
Austin, Texas 78702
  Tel. 512-623-7727
  Fax. 512-623-7729

By /s/ Jeff Edwards
JEFF EDWARDS
State Bar No. 24014406
Lead Counsel

Scott Medlock
State Bar No. 24044783
Brian McGiverin
State Bar No. 24067760
James C. Harrington
State Bar No. 09048500

TEXAS CIVIL RIGHTS PROJECT
1405 Montopolis Drive
Austin, TX 78741
(512) 474-5073 [phone]
(512) 474-0726 [fax]

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

By my signature above, I certify that a true and correct copy of the foregoing has been served on all counsel of record through the Electronic Case Files System of the Eastern District of Texas.